## Commonwealth *vs.* Robert J. Oliveira.

Bristol. October 7, 2005. - January 23, 2006.

Present: Marshall, C.J., Ireland, Spina, & Cordy, JJ.

*Homicide. Practice, Criminal,* Capital case, Instructions to jury. *Malice. Intoxication.*

At a murder trial, the judge's instruction to the jury with respect to the element of malice in murder committed with extreme atrocity or cruelty was erroneous when read in isolation because it suggested an improper presumption that a person who intentionally uses a dangerous weapon is acting with malice, but the error did not constitute a substantial likelihood of a miscarriage of justice, where the misstatement was a slip of the tongue that went unnoticed even by experienced defense counsel, where the misstatement was between two correct instructions on the same subject describing and repeating the "general rule" that it was permissible to infer malice from the intentional use of a deadly weapon, and where, had the error not occurred, the verdict would have been the same. [842-845]

At a murder trial, the judge properly instructed the jury on how they should consider evidence of intoxication, and he was not required to inform the jury that mental impairment could be considered for the purpose of determining whether the defendant was cognizant of the extremely cruel or atrocious nature of his acts. [845-849]

Indictment found and returned in the Superior Court Department on December 13, 2000.

The case was tried before *Robert J. Kane*, J.

*Eric S. Brandt*, Committee for Public Counsel Services, for the defendant.

*David B. Mark*, Assistant District Attorney (*Alison R. Bancroft*, Assistant District Attorney, with him) for the Commonwealth.

Cordy, J. Following a jury trial, Robert J. Oliveira was convicted of murder in the first degree of Nancy Shonheinz, a woman with whom he had a sporadic relationship. On appeal, the defendant claims that the judge's jury instructions regarding murder by means of extreme atrocity or cruelty contained two

significant errors creating a substantial likelihood of a miscarriage of justice. We find no such likelihood and affirm the conviction. We also decline to exercise our power under G. L. c. 278, § 33E, to reduce the verdict or order a new trial.

1. *Background.* We summarize the evidence in its light most favorable to the Commonwealth. The victim was a thirty-six year old physical therapist employed by St. Luke's Hospital. She and the defendant had known each other since high school and had an "on and off" relationship for many years. The defendant worked on Cape Cod during the week and often spent the weekends at the victim's house in Fairhaven, where he kept some of his possessions, including exercise equipment. The relationship between the defendant and the victim, however, had been deteriorating, and the victim was seeing other men. In early November, 2000, the victim confided in her coworkers that she was "finished" with the defendant and had begun dating someone who she felt was the "right man." On her birthday, November 9, the victim and this man had dinner together. On that same night, the defendant called the victim's sister and asked her to speak to the victim for him. He told her that their relationship was not going well, that he did not want to lose the victim, and that he could not live without her.

At approximately 6 P.M. on Saturday, November 11, the victim arrived at her parents' home, where she spent the next hour. At some point she telephoned her own home to see if the defendant was still there. He answered the telephone, and they argued. The victim's mother overheard her accusing the defendant of going through her pocketbook. The defendant's voice was very loud and the victim held the telephone away from her ear, repeatedly calling him a "wacko." When she finished the telephone call, the victim told her mother that she did not want anything more to do with the defendant and wished him "out of her life forever." The victim left for home at approximately 7 P.M., and her father telephoned and spoke to her there at 9:30 P.M. Sometime after 2 A.M., the victim was beaten with a blunt object, stabbed more than forty times in the chest and back, and died on the floor of one of the bedrooms in her home.

Just before 8 A.M. the following morning, the victim's neighbor, while walking his dog in the nearby woods, saw the

silhouette of a person he recognized to be the defendant at the kitchen sink in the victim's house. At about 8:10 A.M., one of the victim's friends placed a telephone call to her. The defendant answered the telephone and told her that the victim was busy. When the friend insisted on speaking to the victim, the defendant told the friend that she was doing laundry and would call her later.

At 8:58 A.M., that same morning, the defendant telephoned his brother, "Teddy" Oliveira, from the victim's home. He told Teddy that something had happened to the victim and that she was "[l]ying in a puddle of blood." He asked Teddy to contact their father because "I think I'm in trouble over here." When Teddy asked what happened to the victim, the defendant repeatedly said, "I don't know." He then screamed, "I think I'm trying to hang myself for the second time." There was a bang, some gurgling, choking sounds, and more screaming. Teddy urged the defendant to pick up the telephone, to talk to him, and to contact the police. At 9:16 A.M., the defendant dialed 911 and told the Fairhaven police department dispatcher, "There's a death here," and "My girlfriend's dead." He also stated, "[T]his is fucking crazy. Somebody get over here," and when asked what had happened, said, "I don't know. I was drinking, we were drinking. This went on since like four o'clock in the morning."[1]

Officers Peter Joseph and Christopher Kershaw were the first to arrive at the victim's home. The defendant appeared nervous and frantic, and pointed them to a door at the end of the hallway on the first floor. When the officers opened the door, they found the victim's body on the floor covered with a blanket. There was some blood on a nearby bed and a pool of blood around the victim's head. She had no pulse and her skin was very cold. When the blanket was removed, a number of stab wounds on her chest were apparent. Officer Kershaw escorted the defendant out of the room and down the hall into the living room. The defendant kept asking whether the victim was "okay," even

---

[1] The 911 recording was played for the jury. It was also referred to extensively in closing argument by the prosecutor who pointed out its inconsistency with statements later made by the defendant to the police denying that he knew his girl friend was dead when he telephoned the police, and denying any memory of what had been going on "since like four o'clock in the morning."

though he had repeatedly told the dispatcher that the victim was dead. The officer noticed that the defendant had abrasions all around his neck, as well as dried blood on his chin.

The police obtained and executed a search warrant for the house. The house had a working burglar alarm, and there were no signs of forced entry. There was a groove in the stairway banister with a fiber affixed to it matching a bloodstained rope, found in the basement, which the defendant had apparently used in attempting to hang himself.[2] There was evidence of an effort to clean up and dispose of some of the victim's blood in the kitchen sink. In an upstairs bathroom, bloodstains were found in the sinks and on the faucet of one sink. The first-floor bathroom tested positive for blood in the sink, on the faucets, and on the shower floor. Subsequently, at the police station, the defendant tested positive for blood on his left and right hands, his neck area, the inner elbow area of his right arm, his right and left upper arms, his right calf area, and his lower back. His underwear, jeans, T-shirt, and socks also tested positively for blood.

In the kitchen, the police found six empty twelve-ounce "hard lemonade" bottles, two empty beer bottles, a one-gallon Peach Tree Schnapps bottle that was three-quarters full, and one empty Rumplemintz "shot" bottle. Another hard lemonade bottle was found half full on the kitchen table. Testing conducted during the autopsy revealed that the victim did not have any alcohol in her system at the time of her death.

At several points at the house and later at the police station, the defendant gave varying accounts of how much he had had to drink that night, ranging from "two beers" to whatever was found "downstairs" (in the kitchen). Officers who spoke to the defendant testified that they had no trouble understanding him and that he did not appear to be intoxicated, although he did smell of alcohol.[3]

When the defendant was asked about the dark purplish ring

---

[2]At trial, the Commonwealth contended that the defendant's attempt to hang himself was evidence of consciousness of guilt.

[3]After he was taken to the police station, the defendant remained in the booking area for approximately thirteen hours, where he slept and periodically was interviewed by different officers. The interviews were videotaped. The jury watched six hours of the videotape; the rest of the videotape mostly contained footage of the defendant sleeping. The voluntariness of the

around his neck, he responded, "Never mind me. What the fuck happened to Nancy?" When asked if he had tried to take his own life, he stated that he did not know. When asked why his jaw was twitching, he answered, "Well, wouldn't you be nervous? This is fucked up." He eventually told the officers that he and the victim were supposed to go to the movies the night before but they had had an argument so they went back into the house and he had a couple of beers. When asked what the argument was about, the defendant replied, "You don't know the half of it." When asked whether they fought over a boy friend, the defendant answered that he was not sure whether she was dating anyone at the time. He later admitted that the victim told him that he could be replaced and that he knew she was seeing other men.

The defendant also told the police that he and the victim were the only two people in the house, that the victim slept upstairs with him, and that he remembered waking up because the victim was no longer in bed. He looked for the victim and found her lying injured in the downstairs bedroom and telephoned 911. He denied knowing what happened to the victim and claimed that it was a "blank," or "blurry." He did not mention speaking by telephone to either his brother or the victim's friend.

The medical examiner testified that the victim suffered forty-four stab wounds, all inflicted while she was alive. He also testified that there were two lacerations to the back of her head, a "semi-sharp blunt object" having caused the larger one, resulting in a triangular piece of the victim's skull being pushed about one inch into her brain. The victim also had scattered abrasions on her chest and face as well as defensive lacerations on her hands. Multiple sharp and blunt force injuries were the cause of death.

At trial, the Commonwealth proceeded on two theories of murder in the first degree: deliberate premeditation and extreme atrocity or cruelty. Defense counsel did not concede that the defendant was the person who killed the victim. However, he developed evidence of the defendant's intoxication throughout

defendant's statements was not a live issue at trial.

the trial. In closing, defense counsel argued that if the jury should find that the defendant stabbed the victim, intoxication would be a mitigating factor bearing on premeditation, intent, knowledge, and whether the killing was committed with extreme atrocity or cruelty, and that they should find him guilty only of murder in the second degree. The jury found the defendant guilty of murder in the first degree on the theory of extreme atrocity or cruelty.

2. *Discussion.* The only issues the defendant raises on appeal concern the judge's jury instructions on malice and intoxication. The defendant did not object to the instructions at trial. We therefore review the challenged instructions, pursuant to G. L. c. 278, § 33E, to determine whether the instructions created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Rodriguez,* 437 Mass. 554, 559 (2002). We view the charge to the jury in its entirety, "since the adequacy of instructions must be determined in light of their over-all impact on the jury." *Commonwealth* v. *Ferreira,* 417 Mass. 592, 595 (1994), quoting *Commonwealth* v. *Sellon,* 380 Mass. 220, 231-232 (1980).

a. *Malice instruction.* The judge instructed the jury on (1) murder in the first degree based on the theory of deliberate premeditation, (2) murder in the first degree on the theory of extreme atrocity or cruelty, and (3) murder in the second degree, in that order. As to each of these crimes, the judge defined the element of malice. Because a dangerous weapon was used to inflict the fatal wounds, the judge included with each malice instruction an explanation as to what the jury were permitted to infer from the intentional use of such a weapon. The defendant complains that when this instruction was repeated during the judge's charge on murder by extreme atrocity or cruelty, he improperly instructed them that the use of a dangerous weapon established the element of malice, thus creating a "mandatory" (burden shifting) presumption.

With respect to the element of malice in murder committed with deliberate premeditation, the judge instructed that malice "means an intent to cause death." He further explained that the Commonwealth must therefore "prove that the defendant actually intended to cause the death of the deceased." The judge

then correctly told the jury that where a dangerous weapon is used, "[a]s a general rule, you are permitted to infer that a person who intentionally uses a dangerous weapon on another person is acting with malice." He defined "dangerous weapon" as "an item which is capable of causing serious injury or death."

With respect to the element of malice in murder committed with extreme atrocity or cruelty, the judge told the jury to "[l]isten carefully, because this definition differs from the definition of malice that I provided you in defining the elements of first-degree murder with deliberate premeditation." He proceeded to instruct that malice "may be proved in any one of three ways." He further elaborated by instructing them that "[m]alice, in this context, includes an intent to cause death, or an intent to cause grievous bodily harm. With respect to these two ways, the Commonwealth must prove that the defendant actually intended to cause the death of the deceased, or intended to cause the deceased grievous bodily harm." He then added that "[m]alice, for purposes of this theory of murder, also includes an intent to do an act that in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow." He further explained: "Under this third meaning of malice, you must determine, based on what the defendant actually knew at the time he acted, a reasonable person would have recognized that his conduct created a plain and strong likelihood that death would result. In determining whether the Commonwealth has proved this third meaning of malice, you must consider the defendant's actual knowledge of the circumstances at the time he acted." The judge concluded his instruction on the element of malice by stating that "[w]ith regard to a dangerous weapon, as a general matter, a person who intentionally uses a dangerous weapon, as I have defined that term, on another person, is acting with malice," leaving out the phrase, "you are permitted to infer."

The judge next defined the element of malice necessary for murder in the second degree. The judge told the jury that the Commonwealth could again prove malice in any one of three ways, and proceeded to describe those three ways just as he had

described them in his instruction on malice in the context of murder committed with extreme atrocity or cruelty. At the conclusion of this description, he reiterated correctly: "Again, as a general rule, you are permitted to infer that a person who intentionally uses a dangerous weapon is acting with malice."

As the Commonwealth concedes, the judge's instruction, read in isolation, that "a person who intentionally uses a dangerous weapon . . . is acting with malice" is in error, because it suggests a presumption improper under our law. *Commonwealth* v. *Callahan*, 380 Mass. 821, 822-825 (1980). We do not, however, review the words used in jury instructions in isolation from each other. *Commonwealth* v. *Rodriguez, supra* at 559, quoting *Commonwealth* v. *Gunter*, 427 Mass. 259, 267 (1998) ("Error in a charge is determined by reading the charge as a whole, and not by scrutinizing bits and pieces removed from their context"). This is particularly the case where there has been no objection at trial to the words later complained of, and our review is to determine whether the error constitutes a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Ferreira, supra* at 595.

Jury instructions must be construed as a whole to prevent isolated misstatements or omissions from constituting reversible error where there is little chance that the jury would have misunderstood the correct import of the charge. *Commonwealth* v. *Owens*, 414 Mass. 595, 607 (1993). The misstatement here was clearly a slip of the tongue that went unnoticed even by experienced defense counsel. Additionally, the misstatement was made between two correct instructions on the same subject describing and repeating the "general rule" that it was permissible to infer malice from the intentional use of a dangerous weapon. The judge's instruction on the element of malice in murder in the second degree came right after his instruction on murder with extreme atrocity or cruelty, and repeated the three ways that malice could be proved in identical terms — terms that the judge advised them differentiated these forms of murder from murder by deliberate premeditation. He ended by referencing the "general rule," "again," that the jury were "permitted to infer" that a person who used a dangerous weapon is acting with malice. "A reasonable juror could not have . . . been

misled by [the] slip of the tongue" in the middle instruction. *Commonwealth* v. *Grant*, 418 Mass. 76, 85 (1994). See *Commonwealth* v. *Almonte*, 444 Mass. 511, 522-523, cert. denied, 126 S. Ct. 750 (2005) (concluding that mere slip of tongue did not constitute substantial miscarriage of justice); *Commonwealth* v. *Ruiz*, 442 Mass. 826, 839 (2004) (same); *Commonwealth* v. *Lucien*, 440 Mass. 658, 669 (2004) (same); *Commonwealth* v. *Cowels*, 425 Mass. 279, 288 (1997) (same).

Moreover, we will not require a new trial if we are confident that, had the error not been made, the jury verdict would have been the same. *Commonwealth* v. *Nunes*, 430 Mass. 1, 4-5 (1999). In this case, we have that level of confidence. The evidence that the defendant acted with malice is overwhelming. The victim suffered forty-four stab wounds and a severe blow to the back of her head, all inflicted while she was alive. Accordingly, the error does not present a substantial likelihood of a miscarriage of justice.

b. *Intoxication instruction.* As requested by the defendant, the judge instructed the jury on how they should consider evidence of intoxication. The instruction requested and given tracked almost verbatim the Model Jury Instructions on the subject. See Model Jury Instructions on Homicide 61-62 (1999).

The defendant's state of intoxication is, of course, relevant whenever an element of the crime charged requires the jury to consider his intent. *Commonwealth* v. *Cormier*, 427 Mass. 446, 450 (1998). In a murder case such as this, it bears on the question of premeditation and the defendant's intent to kill or cause grievous bodily harm. It also bears on the question of the defendant's knowledge of the circumstances at the time that he acted, a matter relevant to the third prong of malice applicable to murder by extreme atrocity or cruelty, and to murder in the second degree. The defendant does not challenge the correctness of the judge's intoxication instruction as it pertained to these matters.

Because we have held that a jury must also be permitted to consider the defendant's intoxication as a "factor" in determining whether the murder was committed with extreme atrocity or cruelty, see *Commonwealth* v. *Perry*, 385 Mass. 639, 648-649 (1982), the judge instructed the jury that they could consider

"any credible evidence of the defendant's consumption of alcohol in determining . . . whether [the] defendant acted in an extremely cruel or extremely atrocious manner in causing the death of the deceased." Although the judge again used the Model Jury Instructions for this purpose (as the defendant had requested), the defendant now contends that the instruction given was inadequate and constituted error, and that the Model Jury Instruction should be amended. He argues that the instruction should have informed the jury that "mental impairment may be considered for the purpose of determining whether the defendant was cognizant of the extremely cruel or atrocious nature of his acts," citing *Commonwealth* v. *Urrea*, 443 Mass. 530, 535-536 (2005). We disagree that such an instruction is required, and affirm the use of the Model Jury Instruction in this case.

The requirement that any instruction be given on this subject derives from our decision in *Commonwealth* v. *Gould*, 380 Mass. 672, 685-686 (1980) (*Gould*), in which the court concluded that consideration of a defendant's "impaired mind" (in that case mental illness), along with the "character of his acts, is essential if the jury is to serve fully and fairly as the community's conscience in separating extreme atrocity or cruelty from that atrocity or cruelty inevitably included in the destruction of any human life." In reaching this conclusion, the court first stated that the inquiry whether a murder has been committed with extreme atrocity or cruelty "focuses both on the defendant's actions, in terms of the manner and means of inflicting death, and on the resulting effect on the victim." *Id.* at 684, quoting *Commonwealth* v. *Lacy*, 371 Mass. 363, 367 (1976). The court then noted that one of the factors historically deemed relevant to such an inquiry was "a defendant's taking pleasure in causing pain to his victim." *Id.* at 684. Finally, the court reasoned that "[s]urely, if a malicious mind may be considered as evidence that a defendant committed a murder with extreme atrocity or cruelty, then fairness requires that an impaired mind may also be considered as evidence bearing" on that same subject. *Id.* at 684-685.

Three years later, in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 226-228 (1983), the court made it clear that in deciding

*Gould*, it had not created a new mens rea element of the crime of murder committed with extreme atrocity or cruelty. The *Cunneen* court also reiterated its "consistent interpretation of G. L. c. 265, § 1, . . . [that] a murder committed with malice aforethought may be found to have been committed with extreme atrocity or cruelty, even though the murderer *did not know* that his act was extremely atrocious or cruel" (emphasis added). *Id.* at 227, quoting *Commonwealth* v. *Monsen*, 377 Mass. 245, 253 (1979). Finally, the *Cunneen* court confirmed that the defendant's impaired mental capacity was only an evidentiary factor that the jury could consider along with other delineated factors, such as "indifference to or pleasure in a victim's pain," when exercising their "broad discretion," reflective of the "community's conscience, goals, and norms," in determining whether the murder was committed with extreme atrocity or cruelty.[4] *Commonwealth* v. *Cunneen, supra* at 228, quoting *Gould, supra* at 684-685.

The instruction sought by the defendant is similar to language suggested by the court in a *Gould* footnote. There, the court noted that judges might choose to use an instruction in addition to the traditional instructions on extreme atrocity or cruelty in the following language:

> "[T]he judge *may* also instruct the jurors that if they find from the evidence that the defendant had substantially reduced mental capacity at the time the crime was committed, they may consider what effect, if any, the defendant's impaired capacity had on his ability to appreciate the consequences of his choices. Thus, the defendant's mental impairment is to be weighed in evaluat-

---

[4]In *Commonwealth* v. *Cunneen*, 389 Mass. 216 (1983), the court delineated factors (in addition to impaired mental capacity) that a jury can consider in deciding whether a murder was committed with extreme atrocity or cruelty. "These include indifference to or taking pleasure in the victim's suffering, consciousness and degree of suffering of the victim, extent of physical injuries, number of blows, manner and force with which delivered, instrument employed, and disproportion between the means needed to cause death and those employed." *Id.* at 227. It is apparent that evidence of impaired mental capacity might be particularly important in a jury's consideration whether a defendant was indifferent to, or took pleasure in, the victim's suffering and not so important with respect to the jury's consideration of some of the other factors.

ing the evidence of the manner and means of inflicting death, the instrumentalities employed, any disproportion between the means actually needed to inflict death and those employed, the consciousness and degree of suffering of the victim, and the extent of the victim's physical injuries, factors customarily associated with extreme atrocity or cruelty." (Emphasis added.)

*Gould, supra* at 686 n.16.

This language was of course suggested before the court's decision in *Commonwealth* v. *Cunneen, supra.* We have subsequently held that its precise use is not required. See *Commonwealth* v. *Painten,* 429 Mass. 536, 548 (1999), quoting *Gould, supra* ("judge was not required to instruct the jury that they could consider whether the defendant's alleged intoxication affected her ability 'to appreciate the consequences of [her] choices' "); *Commonwealth* v. *Murphy,* 426 Mass. 395, 400 (1998) ("we have never said that the *Gould* instruction must be repeated verbatim").[5] Moreover, the language in the Model Jury Instructions is consistent with our holding in *Commonwealth* v. *Cunneen, supra,* that while reduced mental capacity is relevant to the jury's exercise of their broad discretion as a reflection of the community's conscience, there is no greater mens rea required for murder by extreme atrocity or cruelty than there is for murder in the second degree, and the crime does not require

---

[5]The defendant points to recent language in *Commonwealth* v. *Urrea,* 443 Mass. 530 (2005), to support his argument. The issue in that case, however, was not the adequacy of the jury instructions on extreme atrocity or cruelty, but the relevance of evidence that the defendant could "appreciate the difference between right and wrong." *Id.* at 535. *Urrea*'s reasoning does not change our view on what a judge is required to instruct.

The defendant also points to language used in *Commonwealth* v. *Adorno,* 407 Mass. 428, 432-433 (1990), to the effect "that *Gould* requires that the judge instruct the jury that they may consider the effect that the defendant's mental disease or defect may have had on either his ability to premeditate the crime, or his ability to appreciate the extreme atrocity or cruelty of his act." The instruction in that case was found to be sufficient, and this language dicta. Moreover, with respect to the instruction regarding extreme atrocity or cruelty (as distinguished from premeditation), the *Gould* court did not require a specific form of words, i.e., "the judge may also instruct" — and we have since so held. *Commonwealth* v. *Gould,* 380 Mass. 672, 686 n.16 (1980). See *Commonwealth* v. *Painten,* 429 Mass. 536, 548 (1999); *Commonwealth* v. *Murphy,* 426 Mass. 395, 400 (1998).

that the defendant be aware that his acts were extremely cruel or atrocious.

There was no error.

3. *Conclusion.* None of Oliveira's claims on appeal warrants reversal. We also have reviewed the entire trial record pursuant to G. L. c. 278, § 33E, including the videotaped interviews of the defendant, and conclude that the interests of justice do not require the entry of a verdict of a lesser degree of guilt or a new trial.

*Judgment affirmed.*