Alberto TORRES, Petitioner

v.

Kathleen M. DENNEHY, Commission-
er of Massachusetts Department
of Corrections, Respondent.

C.A. No. 05–30226–MAP.

United States District Court,
D. Massachusetts.

March 26, 2009.

David M. Lieber, Assistant Attorney General, Jonathan M. Ofilos, Susanne G. Reardon, Daniel I. Smulow, Office of the Attorney General, Boston, MA, for Respondent.

John M. Thompson, Thompson and Thompson, PC, Springfield, MA, for Petitioner.

*MEMORANDUM AND ORDER REGARDING PETITIONER'S AMENDED MOTION UNDER 28 U.S.C. § 2254 TO VACATE, SET ASIDE OR CORRECT SENTENCE*

PONSOR, District Judge.

## I. INTRODUCTION

Petitioner Alberto Torres, a state prisoner serving a life sentence following his conviction for first degree murder and various assault and battery charges, has filed this action pursuant to 28 U.S.C. § 2254. He set out four grounds for relief: first, that the evidence was constitutionally insufficient to support his first degree murder conviction; second, that certain statements were admitted at trial in violation of his Sixth Amendment rights; third, that his trial counsel's failure to object to those statements constituted ineffective assistance of counsel; and finally, that testimony regarding an allegation made by an individual who did not testify violated his right to confront the witnesses against him.[1] This court granted Respondent Kathleen M. Dennehy's Motion for Sum-

---

1. Petitioner had also argued that testimony regarding the Grand Jury proceedings was admitted in violation of his right to confront the witnesses against him and his due process right to a verdict based solely on the evidence. He later withdrew that argument, conceding that it had not been exhausted. (Dkt. No. 62, Reply Mem. in Support of Claim Four 4.)

mary Judgment on Grounds 2 and 3 of the Petition on January 4, 2008. (Dkt. No. 48.) Following further briefing and argument from the parties on grounds one and four, this court will now deny Petitioner the relief he seeks in these remaining claims.

## II. *BACKGROUND*

In its prior opinion this court briefly noted the tragic circumstances of the death of the child Clyde Harper, Jr. on October 20, 1996. Some additional facts are now relevant to Petitioner's first and fourth claims, as set forth in the opinion of the Massachusetts Supreme Judicial Court ("SJC"), *Commonwealth v. Torres,* 442 Mass. 554, 813 N.E.2d 1261 (2004). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. §§ 2244 *et seq.,* the factual determinations made by the SJC are presumed correct. *Obershaw v. Lanman,* 453 F.3d 56, 59 (1st Cir.2006) (quoting 28 U.S.C. § 2254(e)(1)).

In August of 1996 Petitioner began residing with his girlfriend, Susan Fappiano, and her three children, fifteen-month-old Clyde Harper, three-year-old Shy-la Harper, and five-year-old Jeffrey Columbus. Before and during the time that Petitioner lived with Fappiano and her children, several friends and neighbors observed Fappiano strike one or both of her older children. None of them ever observed her strike Clyde, and one individual described Clyde as being her "favorite." *Torres,* 813 N.E.2d at 1266.

Neighbors also saw Petitioner strike Jeffrey, and one neighbor described how Shy-la had told her that "Daddy," had hit her. *Id.* That same neighbor also testified that she had been concerned about the way Petitioner treated Clyde. She described seeing Clyde in the family's apartment in September 1996 lying on the couch, crying and unable to walk. When she suggested to Petitioner that the child's leg might be broken, Petitioner insisted that it was not and that the baby had simply fallen off the couch. The following month that same witness saw Petitioner become angry with Clyde and throw him "real hard" onto the couch, knocking the breath out of the baby. *Id.* When Clyde regained his breath and began screaming, Fappiano entered the room, picked him up, and began arguing with Petitioner.

Another neighbor testified that when she went to the apartment on the day of Clyde's death, the boy was lying in a car seat crying. At that time she saw Petitioner pick him up, put him down, and yell at him to "shut up." *Id.* Clyde continued to cry and Petitioner picked him up again, shook him, and again yelled at him to "shut up." *Id.* Petitioner was still yelling at the crying baby when the witness left the apartment. Several hours later emergency personnel, responding to a call from Fappiano, transported Clyde's "lifeless" and bruise-covered body to the hospital where he was pronounced dead. *Id.*

The medical evidence established that Clyde spent the end of his brief life in extreme pain after suffering a number of injuries. Two to eight weeks prior to his death Clyde's femur had been fractured. According to testimony from the prosecution's medical experts, this injury could have been caused by a fall from a considerable height (much higher than a couch), an automobile accident, someone twisting his leg, or someone swinging him by the leg. He had bruises over most of his body, inflicted in the days and hours leading up to his death. Many were "pattern" bruises, indicating that he had been struck with various objects. Clyde also had lacerations to his anus and rectum that were thought to be one to two days old. The most severe injury, the one which led directly to his death, was a complete tear of the small intestine.

At the trial, the pathologist testified that the tear occurred around 8 a.m. on the day of Clyde's death when his small intestine was pushed up against his spine, most likely as a result of a single massive blow with a fist to front of the baby's abdomen. None of the medical experts who testified had ever before seen an injury involving a blow of sufficient force to completely sever the intestine. As a result of this injury, which the experts agreed would have caused severe pain, fecal matter was released into Clyde's abdominal cavity causing peritonitis, an abdominal infection that was the direct cause of death.

As the infection progressed Clyde would have continued to be in extreme pain while still; the pain would have been even worse if he were moved. He would have been unable to eat, and he was likely to vomit. His pallor would have become pale and gray, and his abdomen would have swollen and become rigid. Breathing would have become difficult, and his heart rate and blood pressure would have dropped. In his last couple hours, Clyde would have been lapsing in and out of consciousness. He would not have experienced convulsions or seizures during the period leading up to his death.

Though upsetting to recount, the details of Clyde's injuries and death are relevant because they conflict with various accounts of his death Petitioner provided police. On the night Clyde died, Petitioner nodded in agreement when Fappiano told police that Clyde's bruises were the result of a fall from his stroller during a walk in the woods. Later that same night he gave two statements to police.

First he said that at 6 p.m., approximately two hours before his death, Clyde had fallen while in the living room, and Petitioner had placed him in his crib with a bottle. He stated that he returned later to find that Clyde had consumed half the bottle. Later he heard the baby vomiting, and Petitioner took him to the master bedroom. Clyde was pale and looked like he was going to vomit again. He then stopped breathing, and Fappiano called for help.

In his second statement, Petitioner said that he and Fappiano had been home with the children all day. He repeated the details from his first statement regarding Clyde's fall around 6 p.m. followed by Clyde drinking half a bottle, vomiting, and then unexpectedly ceasing to breathe. He also denied ever hitting any of the children or seeing Fappiano hit the children, other than slapping their hands.

Prior to learning the results of the autopsy, Petitioner told two neighbors that Jeffrey, the five-year-old, had struck Clyde's stomach. On the night of Clyde's death, Petitioner told one neighbor that Jeffrey had stepped on Clyde's stomach. Two days later he told a different neighbor that Jeffrey had jumped on Clyde's stomach.

On October 28, one week after Clyde's death, Petitioner spoke with two state troopers. After being told that Fappiano was blaming him, he told the troopers that "he 'didn't do anything' and that it was Fappiano who had 'abused the kids.' " *Id.* at 1268. He also said that Fappiano had told him that Clyde hurt his leg falling off the couch. He then declined to say more about the abuse.

Two days later he again spoke with the state troopers. He repeated that Clyde had fallen, drunk half a bottle, vomited, and ceased breathing. Then he said he had been lying when he told the troopers that Fappiano had not hit her children, saying that he had seen her strike all of the children numerous times and giving specific examples of times when Fappiano had hit each of the children.

At the trial, the troopers testified that they had told Petitioner on October 28,

1996 that Fappiano was blaming him for Clyde's death. Following each trooper's testimony about Fappiano's allegation, the trial judge instructed the jury that it was not to consider Fappiano's allegation as substantive evidence, but could only consider it as something Petitioner was told prior to making further statements to law enforcement. In her closing statement the prosecutor argued that Petitioner lied to police. In the course of that argument she referred to Fappiano's allegation, and Petitioner's knowledge of it, to explain why the jury should not believe that he was genuinely attempting to assist the police when he said that he had seen Fappiano abuse her children. In concluding that portion of her closing, the prosecutor suggested that Petitioner's lies to the police following Clyde's death reflected his guilty conscience.

## III. THE AEDPA STANDARD

■■■ Under the now-familiar standard of review set out in AEDPA, this court may only grant a state prisoner's petition for *habeas corpus* if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). A state court's decision is "contrary to" clearly established federal law if the state court applies a legal rule that contradicts the rule established by Supreme Court precedent or, "reaches a different result on facts materially indistinguishable from those of a controlling Supreme Court precedent." *Malone v. Clarke*, 536 F.3d 54, 62 (1st Cir.2008) (citing *Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). A state court's decision involves an "unreasonable application" of federal law as established by Supreme Court precedent "if the court either 'iden-

tifies the correct governing legal rule ... but unreasonably applies it to the facts of the particular state prisoner's case'" or unreasonably extends or refuses to extend a legal principle to a new context. *Dagley v. Russo*, 540 F.3d 8, 13 (1st Cir.2008) (citing *Williams v. Taylor*, 529 U.S. 362, 407, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Where "it is the state court's application of governing federal law that is challenged, the decision 'must be shown to be not only erroneous, but objectively unreasonable.'" *Waddington v. Sarausad*, —— U.S. ——, 129 S.Ct. 823, 831, 172 L.Ed.2d 532 (2009) (citing *Middleton v. McNeil*, 541 U.S. 433, 436, 124 S.Ct. 1830, 158 L.Ed.2d 701 (2004)).

■■■ Additionally, the state court's determination of factual issues, meaning its "'recital of external events and the credibility of their narrators,'" is presumed to be correct. *Sanna v. Dipaolo*, 265 F.3d 1, 7 (1st Cir.2001) (citation omitted). A petitioner arguing "that a state court adjudication 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,'" has "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* (citing 28 U.S.C. §§ 2254(d)(2), 2254(e)(1)). This court may apply *de novo* review only when the state court has failed to address a constitutional claim properly raised by the petitioner. *Watkins v. Murphy*, 292 F.3d 70, 75–76 (1st Cir.2002).

## IV. DISCUSSION

### A. Sufficiency of the Evidence.

Petitioner's first ground for relief is that there was insufficient trial evidence for a reasonable jury to conclude that Petitioner was guilty of first degree murder as either the principal or as a participant in a joint venture.[2] It is undisputed that the SJC

2. The jury was instructed that it could find

Petitioner guilty of murder in the first degree

addressed Petitioner's federal claim and invoked the proper Supreme Court precedent, *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, the question for this court is whether the SJC's application of *Jackson* was objectively unreasonable given the facts in this case. *Waddington v. Sarausad*, —— U.S. ——, 129 S.Ct. 823, 832, 172 L.Ed.2d 532 (2009).

■ Under *Jackson* there is constitutionally sufficient evidence for a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781 (emphasis in original). The essential elements of the crime are established by state law. *Id.* at 324 n. 16, 99 S.Ct. 2781. In order to prove first degree murder on a theory of principal liability, the prosecution had to show that Petitioner delivered the fatal blow and did so with malice and extreme atrocity or cruelty. *Torres*, 813 N.E.2d at 1270. To prove first degree murder on a theory of joint venture the prosecution had to prove that Petitioner (1) was present when the fatal blow was struck, (2) had knowledge that Fappiano intended to harm Clyde with malice and extreme atrocity or cruelty, (3) was willing to aid Fappiano, and (4) shared Fappiano's intent to injure the child. *Id.* at 1272–73; *Commonwealth v. Maynard*, 436 Mass. 558, 767 N.E.2d 1, 9 (2002).

■ As to the charge of first degree murder based on principal liability, Petitioner concedes that the SJC correctly concluded that the evidence was sufficient to show that whoever struck the final blow acted with malice and extreme atrocity or cruelty. He argues only that the SJC's

determination that the evidence was sufficient for a reasonable jury to conclude, beyond a reasonable doubt, that it was he, not Fappiano, who inflicted the death-blow was objectively unreasonable. Petitioner asserts that "there are no state court findings of historical fact which are relevant to this inquiry." (Dkt. No. 55, Pet.'s Mem. in Support of Claims One and Four 4.) He then asks this court to engage in a complete review of the trial testimony and conclude that there was even less evidence pointing to Petitioner as the killer than the SJC identified.

■ AEDPA does not permit this court to revisit the full trial record and come to its own conclusions. *Cf. Pike v. Guarino*, 492 F.3d 61, 70 (1st Cir.2007) ("Where ... a federal district court sitting in habeas jurisdiction essentially replicates the entirety of the relevant state court evidentiary record, it is on very shaky ground.") The state court's determination of the events that could have been proved by the evidence is presumed correct. *Sanna v. Dipaolo*, 265 F.3d 1, 7 (1st Cir.2001) (citation omitted). Were this court in a position to review the evidentiary record independently and without regard to the state court's conclusions, Petitioner's detailed review of the evidence might have force. However, since this review falls short of establishing by clear and convincing evidence that the state court's factual findings were incorrect, this court is bound to accept them.

Based on the evidence presented, the SJC determined that a reasonable jury could have found that (1) Clyde must have been killed by a blow inflicted by Fappiano or Petitioner; (2) Fappiano had a history of hitting her older children, but not

---

if it found either that he was the principal and personally committed the offense or that he acted as a joint venturer with Fappiano. *Torres*, 813 N.E.2d at 1270. Thus, to be entitled

to *habeas* relief Petitioner must establish that the evidence was constitutionally insufficient to support *either* theory.

Clyde; (3) Petitioner had a history of abusing Clyde; and (4) Petitioner lied to the police to cover up his guilt. A jury that believed each of these conclusions would have a sufficient basis to believe that Petitioner was the actual perpetrator of Clyde's murder.

Petitioner argues that there was only a "modicum" of evidence tending to show that Petitioner was more likely than Fappiano to have inflicted the blow and that under *Jackson*, a "mere modicum" of evidence cannot "rationally support a conviction beyond a reasonable doubt." *Jackson*, 443 U.S. at 320, 99 S.Ct. 2781. It would have been unreasonable, counsel argues, for the SJC to conclude that a "modicum" of evidence was, by itself, enough to justify a conviction beyond a reasonable doubt.

This may be true in principle, but it is an unfair characterization of what the SJC did. The SJC lined up all the evidence, noted that there was overwhelming evidence that either Fappiano or Petitioner had inflicted the final blow and that there was evidence from which a reasonable jury could have inferred that Petitioner was more likely than Fappiano to have struck that blow. The evidence pointing to Petitioner instead of Fappiano did not exist in a vacuum but was layered on top of overwhelming evidence that one of the two delivered the blow. Viewing the evidence in this way, this court cannot conclude that the SJC applied *Jackson* in an objectively unreasonable way, when it determined that there was sufficient evidence for a reasonable jury to conclude that Petitioner struck the fatal blow.

■ Having found that the SJC's conclusion as to the sufficiency of the evidence to support a conviction based on a principal responsibility was not unreasonable,

the court could conclude its sufficiency-of-the-evidence analysis. However, Petitioner's claim would fail even if the court had reached the opposite conclusion as to principal liability, because the SJC's determination that the evidence was sufficient to support a conviction based on a joint venture theory was also not objectively unreasonable.

Petitioner does not dispute that the evidence was sufficient to establish the first element for a conviction based on joint venture: that Petitioner was present at the scene of the crime. He asserts, however, that there was insufficient evidence to establish that he was more than a passive observer at the scene.[3] Without more, he argues that a reasonable jury could not find, beyond a reasonable doubt, the other three elements: that he knew that Fappiano intended to act with malice and extreme atrocity or cruelty, shared that intent, and was willing to help.

The SJC determined that the jury could have concluded that Fappiano and Petitioner had been jointly abusing her children for some time before Clyde's death and that "[t]heir mutual involvement in that abuse would have the effect of encouraging and aiding the other in each ongoing act of abuse." *Torres*, 813 N.E.2d at 1272. Strong evidence suggested that there was a history of abuse in the home perpetrated by both Fappiano and Petitioner, that Clyde had suffered serious injury (including a broken leg) for some time before his death, and that both Fappiano and Petitioner failed to seek medical treatment for him during periods of time when he was in great distress from his injuries.

It was not unreasonable for the SJC to conclude that this evidence was sufficient to support an inference that Petitioner

---

**3.** How any adult might have passively looked on while the child suffered the extreme agony the medical witnesses described is a question the court will not attempt to answer.

shared an intent to cause Clyde grievous bodily harm or intended actions which a reasonable person would have known were likely to cause death. *Commonwealth v. Oliveira*, 445 Mass. 837, 840 N.E.2d 954, 959 (2006) (agreeing that the malice element for first degree murder can be proved by showing "an intent to cause death," "an intent to cause grievous bodily harm," or "an intent to do an act that in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow.") The fact that the conviction was for murder, not child abuse, does not change this analysis because the abuse was so severe, and the child's distress so great, that the jury could well conclude that anyone involved in the abuse acted without regard to the baby's suffering and with knowledge of the possibility that the abuse could lead to death. *Id.*; *Commonwealth v. Cunneen*, 389 Mass. 216, 449 N.E.2d 658, 665 (1983) (stating that indifference to a victim's suffering is one of the factor's upon which a finding of extreme atrocity or cruelty can be based).

In sum, Petitioner's contention in claim one of factual insufficiency lacks merit. The evidence was sufficient to support the jury's verdict on either a theory of principal or joint liability.

### B. *Right of Confrontation.*

Petitioner's fourth and final basis for his petition is that his Sixth Amendment right of confrontation was violated. He asserts that the state troopers should not have been permitted to testify that Fappiano was "blaming him," because her alleged statement was testimonial and accusatory and therefore should have been barred as a violation of the Confrontation Clause. He further argues that since the SJC did not even address the Confrontation Clause issue, this court should review it *de novo*.

*De novo* review is not appropriate here. The SJC determined that the troopers' testimony that Fappiano "blamed" Petitioner was not hearsay, foreclosing the need to further consider whether Petitioner's Confrontation Clause rights were violated. *Crawford v. Washington*, 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (stating that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.") (citing *Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985)). Having determined that the SJC did address Petitioner's Confrontation Clause claim, this court's review is limited to determining whether the SJC's analysis "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d).

It is undisputed that the federal law relevant to the Confrontation Clause issue was established by the Supreme Court in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and *Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985). "A state court ... does not need to cite Supreme Court precedents so long as 'neither the reasoning nor the result of the state-court decision contradicts [those precedents].'" *Petrillo v. O'Neill*, 428 F.3d 41, 45 (1st Cir.2005) (alteration in original). Here, the SJC relied on two state cases, *Commonwealth v. Brum*, 438 Mass. 103, 777 N.E.2d 1238, 1250–51 (2002) and *Commonwealth v. Furr*, 58 Mass.App. Ct. 155, 788 N.E.2d 592, 597 (Mass.2003), each of which cited and applied *Bruton* and *Street*.

In *Bruton*, the Supreme Court ruled that a petitioner's Confrontation Clause rights were violated when a jury was permitted to hear a co-defendant's confession,

though it was hearsay as to the petitioner, and that this violation could not be cured with a limiting instruction. The Supreme Court later narrowed the field of cases to which *Bruton* applied in *Street*, carving out an exception where an accomplice's confession was admitted "for the nonhearsay purpose of rebutting [the defendant's] testimony that his own confession was coercively derived from the accomplice's statement." *Street*, 471 U.S. at 410, 105 S.Ct. 2078.

 Following *Street*, it is clear that the a limiting instruction is insufficient to prevent a defendant's rights under the Confrontation Clause from being violated *only* when inculpatory statements made by a non-testifying associate are admitted for their truth. Where a non-testifying associate's inculpatory statements are admitted for another, valid purpose and the validity of that purpose can be addressed through cross-examination of the witness through whom the statements come in, there simply is no Confrontation Clause violation.

 The court's review is therefore limited to determining whether the SJC applied federal law unreasonably when it concluded that Fappiano's reported accusation was offered for a nonhearsay purpose, namely to provide an explanation, other than truth, as to why Petitioner began to point the finger at Fappiano. Petitioner suggests that the SJC's conclusion was unreasonable, because in order to use the statement even for this nonhearsay purpose the jury would first have to accept it for its truth. Additionally, he argues that the SJC was unreasonable to apply the *Street* exception here because the evidence came in during the prosecution's case-in-chief. Finally, he asserts that the SJC's conclusion was unreasonable because the prosecutor violated Massachusetts law in the closing by using the Fappiano allegation to support a consciousness of guilt argument.

None of these contentions is correct. First, the jury did not have to believe the truth of Fappiano's allegations in order to use them in the manner urged by the prosecution. The most important aspect of the testimony regarding Fappiano's allegation was that the troopers had communicated the allegation to Petitioner a short time before he amended his previous statements to assert that Fappiano had abused her children. The jury did not have to believe he was actually guilty or even that Fappiano had actually blamed him, in order to believe that his statements accusing Fappiano of abusing her children were not motivated by a genuine desire to assist the police.

Second, the fact that the relevant testimony in *Street* was presented during the prosecution's rebuttal was not itself critical to the Court's analysis in *Street*; the SJC's failure to focus on that detail did not result in an unreasonable application of *Street*. What mattered in *Street* was that, when used to rebut an argument made by the petitioner, the accomplice's confession was not hearsay.

In this case, the SJC found that the prosecution wanted to use the Fappiano accusation to show that Petitioner was not trying to cooperate with the police when he changed his story. The introduction of the troopers' testimony regarding Fappiano's accusations, true or untrue, therefore had a legitimate, nonhearsay purpose. This conclusion was hardly unreasonable. As in *Street*, Petitioner would not have been able to challenge the troopers' testimony by calling Fappiano to ask her about what she had actually said.

 Finally, Petitioner has asserted that the SJC's conclusion that the Fappiano allegation was nonhearsay was unreasonable because, in her closing, the prosecutor urged the jury to believe that Petitioner's reaction to Fappiano's allega-

tion was substantive evidence of his consciousness of guilt. This misuse of the troopers' testimony would have violated state law. A review of the full transcript of the prosecutor's closing, however, reveals that the prosecutor did not use the evidence in a way that transgressed state law. Massachusetts does not allow a prosecutor to refer to evidence that was admitted for a limited purpose during a closing argument in a way that encourages the jury to use the evidence for another, broader purpose. *Commonwealth v. Rosa,* 412 Mass. 147, 587 N.E.2d 767, 773 (1992). Fappiano's allegation was admitted to explain why Petitioner might have added yet another lie to the story he was telling police and in her closing the prosecutor argued that Petitioner's lies were evidence of consciousness of guilt. This argument did not encourage the jury to treat Fappiano's allegation any differently than the court had instructed.

More importantly, the relevant inquiry is whether the SJC applied the relevant federal law unreasonably, not whether the state properly applied its own law. *Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'") Having determined above that the SJC's hearsay decision was consistent with relevant federal law, the court need not consider whether the hearsay decision was consistent with state law. *Id.*

## V. *CONCLUSION*

For the reasons set forth above, Petitioner is not entitled to relief on his first or fourth claim. His Motion to Vacate (Dkt. Nos. 1 & 44) is DENIED, the petition is DISMISSED, and the clerk is ordered to enter judgment for Respondent. This case may now be closed.

It is So Ordered.