COMMONWEALTH *vs.* CHRISTOPHER MIDDLEMISS.

Middlesex. February 7, 2013. - June 17, 2013.

Present: IRELAND, C.J., SPINA, CORDY, DUFFLY, & LENK, JJ.

*Homicide. Robbery. Evidence,* Hearsay, Dying declaration, Identification. *Practice, Criminal,* Capital case, Hearsay, Confrontation of witnesses. *Constitutional Law,* Confrontation of witnesses. *Judicial Estoppel. Identification. Felony-Murder Rule.*

At a murder trial, there was no error in the admission, as a dying declaration, of the victim's statements to a police officer identifying the defendant as his assailant, where, based on the victim's verbal exchanges and physical state, the judge reasonably could have inferred that the victim believed his death was imminent at the time he made the statements. [630-632]

At a murder trial, there was no error in the admission of the victim's statements to a 911 operator identifying the defendant as his assailant, where the statements were nontestimonial for purposes of the confrontation clause of the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, in that the statements were made and solicited for the primary purpose of enabling police to assist in meeting an ongoing emergency. [632-636]

At a murder trial, the judge did not abuse her discretion in declining to apply the doctrine of judicial estoppel to preclude the Commonwealth from making an argument that was inconsistent with the position adopted by the Commonwealth at the earlier, separate trial of a coventurer, where those positions were distinct and not mutually exclusive. [636-638]

INDICTMENTS found and returned in the Superior Court Department on September 28, 2006.

The cases were tried before *Maureen B. Hogan,* J.

*David Keighley* for the defendant.

*Casey E. Silvia,* Assistant District Attorney, for the Commonwealth.

CORDY, J. In the early morning hours of July 4, 2006, the defendant, Christopher Middlemiss, and Joseph Morgan broke into Alberto Cintron's apartment while he was not at home and lay in wait for him to return so they could rob him. Their scheme was foiled when, on his arrival, Cintron recognized the defend-

ant and resisted the robbery. Amidst the ensuing struggle, Cintron was shot five times and died en route to the hospital. Following an investigation, the defendant and Morgan were arrested, indicted, and tried separately.[1] On May 27, 2010, the defendant was convicted of murder in the first degree on the theory of felony-murder with armed robbery while masked as the predicate felony, and unlawful possession of a firearm in violation of G. L. c. 269, § 10 (a). The trial judge sentenced the defendant to life in prison on the murder conviction and imposed an eighteen-month concurrent sentence on the firearm conviction.

On appeal, the defendant argues that the judge erred in admitting statements made by the victim to both a 911 operator and a responding police officer that identified the defendant by name and indicated he lived in an apartment downstairs from the victim's apartment. The defendant contends that the statements to the responding police officer should not have been admitted because they were hearsay not falling within a recognized exception. He also posits that the statements made to the 911 operator were testimonial in nature and, thus, that their admission in evidence violated the defendant's right to confrontation under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.[2] Additionally, the defendant argues that the judge erred in declining to apply the doctrine of judicial estoppel to preclude the Commonwealth from arguing that the victim's intoxication and physical distress did not affect his ability to identify the defendant as one of the shooters, where the Commonwealth had previously argued at Morgan's trial that the victim's identification of Morgan

---

[1]Joseph Morgan was convicted of murder in the first degree on a theory of felony-murder, armed assault in a dwelling, unlawful possession of a firearm, and unlawful possession of ammunition. We affirmed his convictions. *Commonwealth* v. *Morgan*, 460 Mass. 277, 278 (2011).

[2]The defendant does not specify whether he is challenging the admissibility of the victim's statements under the Sixth Amendment to the United States Constitution, art. 12 of the Massachusetts Declaration of Rights, or both. This does not affect our analysis, however, because "in cases like this one involving the hearsay rule and its exceptions, we have always held that the protection provided by art. 12 is coextensive with the guarantees of the Sixth Amendment." *Commonwealth* v. *Lao*, 450 Mass. 215, 223 (2007), *S.C.*, 460 Mass. 12 (2011). Thus, whether analyzed under the Sixth Amendment or art. 12, the same result pertains.

as an "Asian kid" had been unreliable. Finally, the defendant urges this court to invoke its plenary power under G. L. c. 278, § 33E, to grant a new trial or, alternatively, to reduce the verdict on the murder charge.

We conclude that the victim's statements to the 911 operator were properly admitted as excited utterances and were nontestimonial insofar as they were made and solicited for the primary purpose of enabling the police to assist in meeting an ongoing emergency. We also conclude that his statements to the police officer at the scene were admissible as dying declarations and consequently not subject to the constraints of the confrontation clause. Finally, we reject the defendant's judicial estoppel contention because the positions taken by the Commonwealth at the defendant's trial and at Morgan's trial with respect to the reliability of the victim's identifications are distinct and not mutually exclusive. Because we find no reversible error and discern no basis to exercise our authority under G. L. c. 278, § 33E, we affirm the defendant's convictions.

*Trial.* We summarize the facts the jury could have found, reserving certain details for our discussion of the issues raised. Among the witnesses at trial were Scott Russell and Colin Ferderer, both admitted confederates of the defendant and Morgan in the plan to rob the victim.[3] Russell and Ferderer testified that Morgan and Russell had recently moved into an apartment downstairs from the victim's and that the defendant was there often. They also testified that Morgan, Russell, and the defendant had met the victim and his dog and that the victim was known to have "a lot" of money from selling drugs. On the night of the planned robbery, Ferderer provided the defendant and Morgan with firearms. The defendant and Morgan then donned hooded sweatshirts and bandanas to disguise themselves and, by means of a key procured by a friend of the victim's girl friend, entered and concealed themselves in the victim's apartment to await his arrival. Meanwhile, Russell and Ferderer waited in a getaway vehicle.

At some point after 2 A.M., the victim arrived home with a

---

[3]In exchange for their testimony, the Commonwealth reduced the charges against Colin Ferderer and Scott Russell from murder in the first degree to manslaughter.

friend, Curtis Glenn. Glenn testified at trial to what occurred when he and the victim entered the apartment to find the two masked robbers. According to Glenn, the victim's dog, which had been locked in the bathroom but let out by the victim, demonstrated familiarity with the defendant, causing the victim to ask, "Chris [Middlemiss], is that you?" An altercation followed, and Glenn heard and saw gunshots as he fled into the victim's bedroom before escaping through the bedroom window.

The defendant's statement, given to police following his arrest, was admitted at trial. In the statement, he confessed to his involvement in the robbery and being armed. He also admitted that the victim looked him straight in the face and said, "Chris?" The defendant claimed that Morgan, not he, fired the shots that killed the victim in the altercation that followed. He further claimed that he did not even know if his gun was loaded.

The victim's 911 telephone call, made as he lay fatally wounded, was also admitted in evidence. In the call, the victim pleaded for help because he had been "shot" and hurt "bad." In that call, the operator asked the victim, "Do you know who shot you?" to which the victim responded, "Downstairs neighbor, Apartment 2, first floor. His name is Chris." In response to further inquiry, the victim said, "And there was an Asian kid with him."

Finally, the jury heard testimony that Lowell police officers and paramedics responded to the victim's 911 call and, when they entered his apartment, found him lying in a large pool of blood on the floor of the living room. While tending to the victim, the paramedics told Officer Steven Coyle of the Lowell police that the victim was hurt badly and might not live. Coyle relayed this to the victim and asked who shot him. The victim replied, "Chris. He lives downstairs." The victim also confirmed that the shooter "lived in the same building directly below him."

After the paramedics left with the victim, police performed a protective sweep of the downstairs apartment based on the victim's statements that the killer could still be in the building. The defendant was not found in the downstairs apartment. The victim died en route to Lowell General Hospital.

*Discussion.* 1. *Admissibility of the victim's out-of-court statements.* The defendant contends that the judge erred by

admitting in evidence the victim's statements to the 911 opera-
tor and Coyle. In order for the victim's out-of-court statements
to be admissible, they must each fall within an exception to the
hearsay rule under our common-law rules of evidence, *Com-
monwealth* v. *Beatrice*, 460 Mass. 255, 258 (2011) (*Beatrice*),
and given that the defendant did not have a prior opportunity
for cross-examination, the statements must be nontestimonial
for the purposes of the confrontation clause of the Sixth Amend-
ment and art. 12. See *Commonwealth* v. *Smith*, 460 Mass. 385,
391 (2011).

In a bench order granting the Commonwealth's motion in
limine, the judge found by a preponderance of the evidence that
the victim's statements to the 911 operator that the person who
shot him was the "[d]ownstairs neighbor, Apartment 2, first
floor. His name is Chris," qualified as an excited utterance. The
judge also found that the victim's statements to Coyle that he
had been shot by a man named "Chris," who lived in an apart-
ment directly beneath that of the victim, qualified as a dying
declaration. We review the judge's admission of the victim's
hearsay statements for prejudicial error, *Commonwealth* v. *Fle-
botte*, 417 Mass. 348, 353 (1994), and her finding that those
statements did not violate the defendant's right to confrontation
for constitutional error, *Commonwealth* v. *Burgess*, 450 Mass.
422, 431-432 (2008).

a. *Evidentiary objections.* On appeal, the defendant does not
challenge the judge's finding that the victim's 911 statements
qualified as excited utterances.[4] He does, however, challenge
the judge's conclusion that the victim's statements to Coyle
qualified as dying declarations. Specifically, he argues that the

---

[4]In order for a declarant's statement to qualify as an excited utterance, the
statement must be made in response to an event that is sufficiently startling to
render the declarant's normal reflective thought processes inoperative, and the
declarant's reaction must actually be spontaneous. Mass. G. Evid. § 803(2)
(2013). See *Commonwealth* v. *Santiago*, 437 Mass. 620, 623 (2002). Although
the defendant does not suggest otherwise, here there is no doubt that the
victim's statements to the 911 operator qualified as excited utterances, where
the statements were made immediately after the victim had been shot five
times and was calling for assistance. See *Commonwealth* v. *Nesbitt*, 452 Mass.
236, 246 (2008) (murder victim's statements to 911 operator, regarding her
need for help and identity of her attacker, were spontaneous utterances, where
victim had sustained twenty-three stab wounds only moments before call).

circumstances surrounding the victim's statements do not objectively indicate that he believed he was going to die.

In homicide prosecutions in Massachusetts, a victim's out-of-court statement may qualify as a dying declaration if the "statement [is] made . . . under the belief of imminent death and [the declarant] died shortly after making the statement, concerning the cause or circumstances of what the declarant believed to be the declarant's own impending death or that of a co-victim." Mass. G. Evid. § 804(b)(2) (2013). See *Commonwealth* v. *Vona*, 250 Mass. 509, 511 (1925). Here, the victim had been shot five times and was lying in a pool of blood. During the 911 call, he repeatedly told the operator to "hurry" and that he was "bad." When Coyle asked the paramedics whether the victim would live, they responded that they did not know and that he was "in a bad way." Coyle relayed that prognosis to the victim and told him that he might "succumb" to his injuries. Based on these verbal exchanges, as well as the victim's physical state, the judge reasonably could have inferred that the victim believed his death was imminent at the time he made the statements. In these circumstances, we see no error in their admission as a dying declaration.

b. *Confrontation clause.* The defendant argues that the victim's statements to the 911 operator were testimonial, and that the defendant's right to confrontation under the Sixth Amendment and art. 12 was violated because the victim was unavailable at trial and the defendant did not have a prior opportunity to cross-examine the victim about his out-of-court statements.[5,6] See *Crawford* v. *Washington*, 541 U.S. 36, 59 (2004) (*Crawford*).

---

[5]The confrontation clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Article 12 states: "[E]very subject shall have a right to produce all proofs, that may be favorable to him; [and] to meet the witnesses against him face to face . . . ."

[6]The defendant concedes that the admission of a dying declaration does not implicate the confrontation clause. We note that "the confrontation clause 'is most naturally read as a reference to the right of confrontation at common law,' " which recognized dying declarations as an exception to the right of confrontation. *Commonwealth* v. *Nesbitt, supra* at 250, quoting *People* v. *Monterroso*, 34 Cal. 4th 743, 765 (2004), cert. denied, 546 U.S. 834 (2005), quoting *Crawford* v. *Washington*, 541 U.S. 36, 54 (2004). For this reason, "in the unique instance of dying declarations, we ask only whether the statement

See also *Commonwealth* v. *Burgess, supra* at 426. The Commonwealth contends that the victim's statements to the 911 operator were properly admitted because they were made in the course of police questioning (the primary purpose of which was to enable the police to respond to an ongoing emergency) and, thus, were nontestimonial. See *Michigan* v. *Bryant*, 131 S. Ct. 1143, 1160-1161 (2011) (*Bryant*). See also *Commonwealth* v. *Smith, supra*; *Beatrice, supra*.

Following the Supreme Court's decision in *Crawford, supra*, we decided *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 3 (2005), cert. denied, 548 U.S. 926 (2006) (*Gonsalves*), in which we held that "statements made in response to questioning by law enforcement agents are per se testimonial, except when the questioning is meant to secure a volatile scene or to establish the need for or provide medical care." Following our decision in *Gonsalves*, the United States Supreme Court decided *Davis* v. *Washington*, 547 U.S. 813, 822 (2006) (*Davis*), in which the Court held:

> "Statements are nontestimonial when made in the course of police interrogation *under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.* They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (Emphasis added.)

The *Davis* Court then listed factors, including the existence of an ongoing emergency, that distinguished the testimonial statements in *Crawford, supra*, from the nontestimonial statements in *Davis*. Those factors included (1) whether the declarant was speaking about events as they were "actually happening, rather than describ[ing] past events"; (2) whether any reasonable listener would recognize that the declarant was facing an "ongoing emergency"; (3) whether what was asked and answered was

---

is admissible as a common-law dying declaration, and not whether the statement is testimonial." *Commonwealth* v. *Nesbitt, supra* at 251. Because the statements made to Coyle were properly admitted as a dying declaration, their admission does not violate the confrontation clause. See *id.*

necessary to resolve the present emergency rather than simply to learn what had happened in the past; and (4) the level of formality of the interview. *Id.* at 827. Following *Davis*, we correctly noted that these "indicia" help determine whether, objectively, the "primary purpose" of a statement may be said to be testimonial. *Commonwealth* v. *Galicia*, 447 Mass. 737, 743-744 (2006).

More recently, in *Bryant*, the Supreme Court reiterated that the touchstone of the confrontation clause analysis is whether the *primary purpose* of a declarant's out-of-court statement is testimonial or nontestimonial — that is, whether the statement is intended to "prove past events potentially relevant to later criminal prosecution." *Bryant, supra* at 1154, quoting *Davis, supra* at 822. The Court reaffirmed its holding in *Davis, supra* at 827, that the existence of an ongoing emergency is "simply one factor — albeit an important factor — that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Bryant, supra* at 1160. Other factors include (1) the formality of the statements, *id.,* and (2) the nature of "the statements and actions of both the declarant and interrogators," *id.,* citing *Davis, supra* at 827 (stressing nature of what was "asked and answered"). As the *Bryant* Court underscored, these are concurrent factors to be considered in the primary purpose analysis. *Bryant, supra.*

With this multifactor framework in mind, the *Bryant* Court nevertheless stressed the centrality of the ongoing emergency factor in the primary purpose analysis. *Id.* at 1162. The Court explained that determining the existence of an ongoing emergency is an "objective" and "highly context-dependent inquiry." *Id.* at 1156, 1158. The Court further explained that the "existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public." *Id.* at 1162. Factors bearing on the existence of an ongoing emergency include (1) whether an armed assailant poses a continued threat to the victim or the public at large, (2) the type of weapon that has been employed, and (3) the severity of the victim's injuries or medical condition. *Id.* at 1158-1159. See *Beatrice, supra* at 260-261. Thus, in certain circumstances, the potential scope and duration of an ongoing emergency may

continue even after the perpetrator has left the scene. See *Bryant*, *supra* at 1164 (statement of wounded victim regarding description of shooter, then at large, not testimonial because description was necessary to enable police assistance in ongoing emergency).[7] The Court did not place any concrete physical or temporal limits on the duration of an ongoing emergency, but it did indicate that an ongoing emergency does not exist "in every place or even just surrounding the victim for the entire time that [a] perpetrator of a violent crime is on the loose." *Bryant*, *supra* at 1159. The exact point at which an emergency arises and dissipates is fact specific and is properly left to the trial courts. *Id.*

Following *Bryant*, *supra*, we decided *Beatrice*, *supra*, which applied *Bryant*'s expanded ongoing emergency analysis. In that case, we concluded that a 911 telephone call for help placed by a person who had just been beaten by her "boy friend" was admissible, and that the 911 operator's questions regarding the boy friend's name, and the victim's response, were properly admitted as necessary information for the responding officers to safely render aid to the victim. *Beatrice*, *supra* at 263-264.

Here, in circumstances similar to, but even more dangerous than, those present in *Beatrice*, we must consider whether the primary purpose of the questions posed to the victim and the victim's statements in response that the shooter's name was "Chris" and that he was the "[d]ownstairs neighbor, Apartment 2, first floor," was for a reason other than creating an out-of-court substitute for trial testimony. Given its centrality, we begin with the "ongoing emergency" factor. *Bryant*, *supra* at 1162. At the time of the call, the victim had been shot five times in the torso and lay in a pool of blood on his apartment floor, pleading for help. See *id.* at 1158-1159. Consequently, the responders had reason to believe that the perpetrator was likely in possession of a gun and could potentially inflict significant

---

[7]This is consistent with our decision in *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 9 n.4 (2005), cert. denied, 548 U.S. 926 (2006), where we noted that "situations may occur in which the 'volatile scene' is no longer restricted to the scene of the original incident, such as when law enforcement officers become aware that a fleeing party to the incident is driving while under the influence of alcohol or drugs, or if such a person is armed and known to be seeking to carry out specific threats, or certainly if a hostage is involved. These situations pose immediate danger to the safety of the community."

further injury to the victim or to the responding police officers. See *id.* Additionally, the location of the shooter was unknown, and given the nature of the attack on the victim, it was likely that responders and other occupants of the building remained at risk. *Id.* In short, the identity of the person with the gun, if known, was information critical to the police response. The fact that the shooter was indeed a neighbor highlights the importance of the 911 operator's questions regarding the shooter's identity.

In addition, the statements were highly informal. The conversation took place over the telephone, was prompted by the unexpected need to address the victim's dire condition, and was plainly "distinguishable from the formal station-house interrogation in *Crawford.*" *Bryant, supra* at 1160, citing *Davis, supra* at 827. Additionally, the parties' words and actions do not evince any testimonial intent. The purpose of the victim's telephone call was to seek medical assistance, which is clear from his statement that he had been "shot," that he was "bad," and that responders needed to "hurry." Similarly, the 911 operator's questions and the victim's answers were concerned primarily with assessing the victim's medical condition and collecting as much information as possible to prepare first responders for what they would soon encounter. See *Bryant, supra,* quoting *Davis, supra.* Thus, the exchange occurred as the situation unfolded and was not backward looking. See *Bryant, supra.* Although we have recognized that " 'a conversation which began as an interrogation to determine the need for emergency assistance' can 'evolve into testimonial statements,' " *Beatrice, supra* at 262, quoting *Bryant, supra* at 1156, that is not the case here. The victim was asked not about the circumstances leading up to the shooting, but only about the nature of his injuries, where he was located, who shot him, and where the shooter might be. The primary purpose of the interrogation was plainly nontestimonial, and the judge did not commit constitutional error by admitting the victim's statements at trial.[8]

2. *Judicial estoppel.* The defendant argues that the Com-

---

[8]The circumstances here are markedly different from those in *Commonwealth v. Simon,* 456 Mass. 280, 297-298, cert. denied, 131 S. Ct. 181 (2010), where the victim suggested investigative strategies for the police, such as going to a particular gym to look for a member named "Wally."

monwealth adopted inconsistent positions at his and Morgan's trials, in violation of the doctrine of judicial estoppel. We disagree.

"The purpose of the doctrine [of judicial estoppel] is to prevent the manipulation of the judicial process by litigants." *Commonwealth* v. *DiBenedetto*, 458 Mass. 657, 671 (2011) (*DiBenedetto*), quoting *Canavan's Case*, 432 Mass. 304, 308 (2000). "As an equitable doctrine, judicial estoppel is not to be defined with reference to 'inflexible prerequisites or an exhaustive formula for determining [its] applicability.'" *DiBenedetto, supra*, quoting *Otis* v. *Arbella Mut. Ins. Co.*, 443 Mass. 634, 640 (2005) (*Otis*). "Rather, the doctrine is properly invoked whenever a 'party is seeking to use the judicial process in an inconsistent way that courts should not tolerate.'" *DiBenedetto, supra*, quoting *Otis, supra*. "[T]wo fundamental elements are widely recognized as comprising the core of a claim of judicial estoppel. First, the position being asserted in the litigation must be 'directly inconsistent,' meaning 'mutually exclusive' of, the position asserted in a prior proceeding[;] . . . [and] [s]econd, the party must have succeeded in convincing the court to accept its prior position." *DiBenedetto, supra*, quoting *Otis, supra* at 640-641.

The defendant claims that the Commonwealth's position at Morgan's trial was that the victim's blood alcohol level and his blood loss explained why the victim mistakenly identified the second shooter as an "Asian kid," which Morgan is not. His assertion is premised, in part, on the Commonwealth's direct examination of the medical examiner and, in part, on the prosecutor's closing argument.[9] Based on this position, the defendant contends that the Commonwealth should have been judicially estopped at his trial from asserting that the victim's identification of the defendant, as communicated to the 911

---

[9]The medical examiner testified that blood loss may lead to a period of diminished capacity before one loses consciousness and that the victim had a urine alcohol level of "0.17 grams per cent." In closing the prosecutor argued: "There's no one suggesting [the victim] has a motive to lie. That's ludicrous. But an honest mistake in perception is a certain possibility, isn't it, under those circumstances." At Morgan's trial, defense counsel argued that Morgan could not have been the second shooter because during the 911 call the victim stated that the shooter was accompanied by an "Asian kid," and Morgan is not Asian. The Commonwealth responded by arguing that the victim's identification of the second shooter was mistaken due to blood loss and intoxication.

operator, was reliable. The Commonwealth responds that, although it argued at Morgan's trial that the victim's identification of the second shooter was unreliable, it never argued that the victim's identification of the defendant was unreliable.

We agree that the Commonwealth's positions at the two trials were not mutually exclusive. The evidence regarding the victim's blood loss and intoxication was relevant to the reliability of the victim's identification of both Morgan and the defendant. However, to the extent that the Commonwealth's position in Morgan's trial was tailored to the unreliability of the victim's identification of Morgan and not the defendant, the Commonwealth's position in the defendant's trial was distinct.[10] The judge did not abuse her discretion.

3. *General Laws c. 278, § 33E.* We have reviewed the entire record and discern no basis to grant relief under G. L. c. 278, § 33E.

*Conclusion.* In sum, we reject the defendant's arguments that the victim's statements to Officer Coyle were inadmissible hearsay under our common-law rules of evidence and that the victim's statements to the 911 operator violated his right to confrontation under the Sixth Amendment and art. 12. Additionally, we conclude that the judge did not err in rejecting the defendant's judicial estoppel argument.

*Judgments affirmed.*

---

[10]The record also supports the Commonwealth's contention that despite the victim's intoxication and blood loss, his identification of the defendant may have been more reliable than his identification of Morgan. For example, at the time of the robbery, the defendant had a black eye that was not covered by his mask and would have been visible to the victim, which is significant given that the defendant had discussed his black eye with the victim prior to the robbery. Additionally, the victim's dog's familiarity with the defendant significantly narrowed the pool of possible perpetrators, which is significant given that the defendant had met the victim's dog previously. In conjunction, these two facts may have rendered the victim's identification of the defendant more reliable.