NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11428


COMMONWEALTH  vs.  MARIO GONZALEZ.



Suffolk.     April 11, 2014. - August 19, 2014.

Present:  Ireland, C.J., Spina, Gants, Duffly, & Lenk, JJ.[1]

Homicide.  Evidence, Admissions and confessions, Voluntariness
     of statement, Dying declaration, Prior misconduct,
     Intoxication, Intent.  Practice, Criminal, Capital case,
     Admissions and confessions, Voluntariness of statement,
     Instructions to jury.  Intoxication.  Mental Impairment.
     Intent.


     Indictment found and returned in the Superior Court
Department on March 19, 2009.

     A pretrial motion to suppress evidence was heard by Charles
J. Hely, J., and the case was tried before Geraldine S. Hines,
J.


     David Keighley for the defendant.
     Helle Sachse, Assistant District Attorney, for the
Commonwealth.


     GANTS, J.  In the early morning hours of February 15, 2009,

the defendant stabbed his girl friend multiple times shortly

after they returned to his apartment from a local bar. The

---

[1] Chief Justice Ireland participated in the deliberation on
this case prior to his retirement.

victim died of her wounds later that morning.  A Superior Court jury convicted the defendant of murder in the first degree on a theory of extreme atrocity or cruelty, in violation of G. L. c. 265, § 1.[2]  On appeal, the defendant claims that:  (1) the statements the defendant made from his holding cell in response to police questioning should have been suppressed because he had earlier invoked his right to silence; (2) the admission in evidence of the defendant's invocation of his right to silence created a substantial likelihood of a miscarriage of justice; (3) the trial judge erred in admitting statements made by the victim as dying declarations; (4) the judge erred in admitting certain testimony regarding the defendant's prior bad acts; and (5) the absence of an instruction to the jury that they may consider the defendant's consumption of alcohol in determining whether the defendant acted in a cruel or atrocious manner in causing the victim's death created a substantial likelihood of a miscarriage of justice.  The defendant also requests that we exercise our authority under G. L. c. 278, § 33E, to reduce the conviction to a lesser included offense.  We reject the defendant's first four claims, but agree with the fifth.  We therefore reverse the defendant's conviction of murder in the first degree and remand the case to the Superior Court to allow

---

[2] The jury did not find the defendant guilty of murder in the first degree on the theory of deliberate premeditation.

the Commonwealth to choose between entry of a verdict of murder in the second degree or retrial of the defendant on the charge of murder in the first degree.

Background. We summarize the evidence at trial, but reserve certain details for our discussion of the defendant's claims of error.

The defendant and the victim had been dating for approximately six months before the killing. The victim had asked the defendant to stop drinking, and on one occasion, the victim refused to go home with the defendant because he was intoxicated. The couple spent the evening of February 14, 2009, at a local bar, celebrating Valentine's Day in the company of the victim's mother. During the course of the evening, the victim had a few drinks and the defendant drank steadily. When they left the bar and entered a taxicab at approximately 1 A.M., both the defendant and the victim were intoxicated. The victim's mother was dropped off at her son's house, and the taxicab then drove the defendant and the victim to the defendant's apartment in the Dorchester section of Boston. At approximately 2:30 A.M., the victim telephoned her mother to make sure she arrived home safely.

At 3:15 A.M., the defendant telephoned 911, and reported, in Spanish, that someone had entered his apartment and stabbed

his wife.[3]  The defendant told the 911 operator that he did not know who had entered his home, and explained, "I came a while ago, and my wife left the door open for him and someone entered and I don't know what happened, but . . . she's letting out a lot of blood."

Police and emergency medical technicians arrived at the apartment house within a few minutes, and the defendant brought them to a bedroom in the third-floor apartment.  The victim was lying on a bed, bleeding heavily from stab wounds.  There was blood on the pillows and the doorknob, and blood spatter stains on the walls, but no blood on the floor; a wet mop was discovered behind the door of the defendant's bedroom, and the floor was wet underneath the bed where the victim lay bleeding. Boston police Officer James O'Brien several times asked the victim who had stabbed her, and each time she replied, "I don't want to die."  Upon removing the victim's clothing, emergency medical technician Emilie Howard discovered that she had suffered six stab wounds to her left shoulder, one to her right shoulder, and one to her left chest just below the breast.  The victim had no palpable blood pressure and was "close to dying." In response to Howard's question about the length of the knife

---

[3] The victim and the defendant were not married, but they referred to each other as husband and wife.

used in the attack, the victim implored, "Please don't let me die," four times.

Because he spoke only Spanish and the responding officers spoke only English, the defendant was unable to communicate with the officers who first arrived at the scene. While the emergency medical technicians prepared to transport the victim to the hospital, the defendant was pat frisked; no weapons were found on his person. Shortly thereafter, Officer Omar Cepeda, a fluent Spanish speaker, arrived and spoke with the defendant in Spanish. Officer Cepeda noted that the defendant had "red, glassy eyes" and smelled of alcohol, and that the defendant had fresh wounds to his nose and lip. In response to Officer Cepeda's inquiry, the defendant stated that he had arrived home from drinking at a local bar to find the front door of the apartment open and the victim lying on the bed in a pool of blood. According to the defendant, the victim told him that an unknown person had entered the apartment, demanded money, stabbed her, and fled. In response to Officer Cepeda's question about the cut on his nose, the defendant stated that he had received it about three days ago in a fight. Officer Cepeda told Sergeant Daniel Tracey about the defendant's statements, and Tracey told Cepeda to give the defendant the Miranda warnings. Cepeda recited the warnings to the defendant in Spanish; the defendant said that he understood and had "nothing

to hide."  Thereafter, in response to Cepeda's renewed inquiry about the injury on his nose, the defendant repeated it was from a fight two to three days previously.  The defendant, when asked whether the victim had described her assailant, said that he could not get a description from her.  Cepeda informed the defendant that the victim was still alive, and asked, "Do you want to tell me what happened here?"  The defendant replied, "No."

Meanwhile, paramedics Sean Murphy and Michael Sullivan accompanied the victim in the ambulance to the hospital.  They noted that the victim was pale, had no blood pressure, and had a life-threatening wound.  As Murphy prepared to insert an intravenous (IV) tube, the victim pulled away and looked scared.  Murphy explained to the victim that she was very sick, whereupon the victim allowed him to start the IV.  Following instructions, the victim squeezed Murphy's hand to indicate that she understood what he was saying.  Thereafter, Murphy asked the victim if her husband did this to her.  The victim answered, "Yes."  Sullivan also asked the victim, "Your husband did this?" and the victim answered, "Yes, my husband."  The victim arrived at the hospital at approximately 3:30 A.M.[4]

---

[4] The victim succumbed to her injuries at 7:54 A.M.  The cause of death was multiple stab wounds to the torso.

On arrival at the hospital, the paramedics told police what they had learned in the ambulance. This information was communicated to Sergeant Tracey, who, while the defendant was speaking with Officer Cepeda, ordered the defendant's arrest.

When the defendant arrived at the police station, Cepeda brought the defendant to a holding cell and told him that he (Cepeda) would be across the hall if the defendant needed anything. As Cepeda started to walk away, the defendant said, "I was the one that got hit with a beer bottle in the face." Cepeda turned around and asked him what really happened. The defendant then stated that he had come home from the bar and gotten into an argument with the victim about his drinking. The defendant said that the argument escalated, she hit him with a beer bottle in the face, pulled out a black, folding knife, and charged at him. The defendant stated that he was able to twist the knife away from the victim, and then stabbed her in the back several times. As the victim ran towards the front door, the defendant followed and said, "I'm sorry, I don't know what happened. I don't know why I did this." The defendant then helped the victim into bed, and telephoned 911. Officer Cepeda asked the defendant about the location of the knife. The defendant first responded that it might be in the hallway, then said that it might have been thrown out the bedroom window, and

later said that it might be in another room in the apartment.[5]
At approximately 9 A.M., the defendant called his roommate from
the telephone by the booking desk of the station.  The defendant
left a message on his roommate's voicemail, in which he said he
had been drinking and "had problems with the Puerto Rican woman"
and stabbed her.

Discussion.  1.  Suppression of defendant's statements made
from the holding cell.  Before trial, the defendant moved to
suppress all statements he made to the police.  In the affidavit
accompanying the motion, the defendant stated that Cepeda "did
not speak Spanish, as I know it, very well," and that, as a
result, the defendant did not understand what Cepeda said, and
vice-versa.  He claimed, "Because of my inability to understand,
no statement made by me at the police station was voluntary."
He did not assert that he ever invoked his right to silence.

After an evidentiary hearing, the motion judge, who was not
the trial judge, found that "[t]he defendant spoke freely and
coherently with Officer Cepeda in Spanish" and that "[t]he
defendant had no trouble in understanding Officer Cepeda or in
expressing himself to the officer in Spanish."  The judge denied
the motion to suppress, finding beyond a reasonable doubt that
all of the defendant's statements were voluntary and that the

_____

[5] The police recovered three knives from the premises and
one from the sidewalk in front of the apartment, but none
contained evidence of blood.

defendant made a knowing, intelligent, and voluntary waiver of his Miranda rights. The motion judge did not address the claim that the defendant makes on appeal -- that the defendant invoked his right to silence after being given the Miranda warnings at the apartment -- because no such claim was made at the time of the motion and there was no evidence to support such a claim.[6]

But Officer Cepeda's testimony at trial regarding what the defendant had said at the apartment after he waived his Miranda rights differed from his testimony at the motion hearing. At the motion hearing, Cepeda testified that, after he told the defendant that the victim was still alive, "I asked him again what happened in the apartment, if anything else happened in the apartment." Cepeda stated that the defendant replied, "No, nothing else happened." At trial, however, Cepeda testified as follows:

> The prosecutor: "Did you . . . tell him at that point anything about [the victim's] condition?"
>
> The witness: "Yes, I did."
>
> The prosecutor: "What did you say to him?"
>
> The witness: "I told him she's still alive. Do you want to tell me what happened here?"
>
> The prosecutor: "Did he say anything else?"

---

[6] The Commonwealth agreed not to admit in evidence a statement that the defendant made to the police after his holding cell discussion with Officer Cepeda, conceding that it had been obtained in violation of Commonwealth v. Rosario, 422 Mass. 48, 56 (1996).

The witness:  "He said no."

The defendant contends that Officer Cepeda's testimony at trial demonstrates that he invoked his right to remain silent by answering, "No," to the officer's question.  The defendant, however, did not object to the question or move to strike the answer.  Nor did he ask the trial judge to revisit the denial of the motion to suppress in view of this answer.  As a result, the issue before us is not whether the motion judge erred in denying the motion to suppress or whether the trial judge erred in not revisiting the denial.  "[I]n reviewing a judge's ruling on a motion to suppress, an appellate court 'may not rely on the facts as developed at trial' even where the testimony differed materially from that given at trial."  Commonwealth v. Deramo, 436 Mass. 40, 43 (2002), quoting Commonwealth v. Grandison, 433 Mass. 135, 137 (2001).  Rather, the issue before us is whether, as part of our plenary review of capital cases under G. L. c. 278, § 33E, the failure to recognize the defendant's invocation of his right to silence created a substantial likelihood of a miscarriage of justice.

We consider first whether a substantial likelihood of a miscarriage of justice arose from the admission of evidence at trial that should have been suppressed had the defendant invoked his right to silence.  The defendant made no further statement

at the apartment following his purported invocation, and the defendant concedes that his volunteered statement to Officer Cepeda from the holding cell that he was "the one that got hit with a beer bottle in the face" was admissible.  See, e.g., Miranda v. Arizona, 384 U.S. 436, 478 (1966) ("Volunteered statements of any kind are not barred by the Fifth Amendment [to the United States Consitution]").  Therefore, the only statements at issue are those made by the defendant from his holding cell after Cepeda asked him what really happened.

Had the defendant raised this claim with the trial judge and asked her to revisit the denial of the motion to suppress, the judge could have conducted a new evidentiary hearing, explored with Cepeda whether his testimony was more accurate at the motion hearing or at trial regarding what he asked the defendant and what the defendant said in response, and made findings of fact based on her evaluation of Cepeda's credibility as to what actually was said, which we would accept unless clearly erroneous.  See Commonwealth v. Scott, 440 Mass. 642, 646 (2004).  Without the benefit of such findings, we must determine whether the appeal can be resolved without remanding the case for such findings.  We conclude that no remand is necessary because, even if the defendant were to prevail on remand as to every factual dispute and we were to conclude that all the defendant's statements from the holding cell made after

Cepeda asked him what really happened should have been suppressed, the admission in evidence of those statements did not so materially strengthen the Commonwealth's case as to create a substantial likelihood of a miscarriage of justice.

If these statements were not admitted, the jury would have been left with evidence that the defendant's girl friend was found on a bed in his apartment with multiple stab wounds; that the defendant had fresh wounds on his nose and lip that he reported he had suffered from a fight two or three days earlier; that he told the police that he came back from a bar to find the door open and the victim lying on a bed in a pool of blood even though there was compelling evidence that he had just returned from a bar with her; that he denied knowing anything about her stabbing but told his roommate in a recorded voicemail that he had stabbed the victim and told Cepeda that the victim had hit him with a beer bottle; and that the victim, in the ambulance to the hospital where she soon died, identified the defendant as the person who had stabbed her. Based on this evidence alone, there could be no reasonable doubt that the defendant stabbed the victim and lied about it to the police.

The statements that the defendant claims should have been suppressed provided his most favorable version of events: an escalating argument about drinking, culminating in an assault by the victim, first with a beer bottle and then with a folding

knife, which the defendant wrested from the victim and used to stab her multiple times before apologizing and helping her into bed and calling 911.  It was this narrative that, if credited, permitted him to claim that he acted in self-defense or, if that fell short, that he should be convicted only of manslaughter because the killing was mitigated by reasonable provocation, heat of passion in sudden combat, or the excessive use of force in self-defense.[7]   In short, the admission of this evidence, if credited, gave him his best chance at an acquittal or a lesser verdict.  Under these circumstances, the admission of this evidence did not create a substantial likelihood of a miscarriage of justice because we are substantially confident that, had this evidence been suppressed, the jury verdict would have been the same.  Commonwealth v. Ruddock, 428 Mass. 288, 292 n.3 (1998).

2.  Admission in evidence of defendant's purported invocation of silence.  The defendant also contends that the admission in evidence of Cepeda's answer to the prosecutor's question, "Did [the defendant] say anything else?" compromised

---

[7] Defense counsel in his opening statement claimed that the Commonwealth would be unable to prove that the defendant had not acted in self-defense.  In closing argument, defense counsel stated, "If, in fact, it occurred as the defendant subsequently told the police, that is, as a result of this physical altercation, if you accept that version, then, while he is responsible, it would not be murder, but it would be . . . manslaughter."

the defendant's constitutional right to silence. We recognize that "Miranda warnings contain an 'implicit assurance that a defendant's silence after such warnings will carry no penalty,' and due process requires that, when in the hands of the police, a defendant must be able to 'invoke core constitutional rights without fear of making implied or adoptive admissions.'" Commonwealth v. Beneche, 458 Mass. 61, 73 (2010), quoting Commonwealth v. Peixoto, 430 Mass. 654, 657, 658-659 (2000). See, e.g., Doyle v. Ohio, 426 U.S. 610, 618 (1976). Where there was no objection to the question, and no motion to strike the answer, we consider whether the error, if any, created a substantial likelihood of miscarriage of justice. Beneche, supra at 76. We conclude that, even if the admission of this evidence were error, it did not create a substantial likelihood of a miscarriage of justice in this case.

Although we recognize the risk that the jury may have made an adverse inference that the defendant did not want to tell the officer what really happened because he had committed the stabbing, we are confident that this adverse inference would have added little to the overwhelming weight of the evidence of the defendant's guilt. The prosecutor in closing argument referred to this testimony, but suggested that it showed the defendant's lack of empathy for the victim, not his fear of the

consequences of telling the truth.[8]  This inference was supported
more strongly by other testimony, including his demeanor during
the recorded phone call to his roommate and his characterization
of the victim as "the Puerto Rican."  Therefore, we are
substantially confident that, if this testimony had never been
heard by the jury, their verdict would have been the same.  See
id. at 75-76 (although defendant's statement, "I don't want to
talk about it," "should not have reached the jury, and the
prosecutor should not have mentioned it in the closing argument,
. . . [it] did not cause a substantial likelihood of a
miscarriage of justice").

    3.  Dying declaration.  The defendant argues that the judge
erred by permitting paramedic Sean Murphy to testify, over the
defendant's objection, that the victim, while being transported
to the hospital, asserted that her "husband" "did this to
[her]."  We conclude that the victim's statements were properly
admitted as dying declarations.

    "[A] victim's out-of-court statement may qualify as a dying
declaration if the 'statement [is] made . . . under the belief
of imminent death and [the declarant] died shortly after making
the statement, concerning the cause or circumstances of what the

_____

    [8] The prosecutor in closing argument said:  "Officer Cepeda
says to him, after [the victim] was taken away but before they
made any decision to arrest him:  'She's still alive.  Is there
anything else you want to tell me?'  'No.'  Not good, what
hospital is she going to, but no."

declarant believed to be the declarant's own impending death or that of a co-victim.'" Commonwealth v. Middlemiss, 465 Mass. 627, 632 (2013), quoting Mass. G. Evid. § 804 (b) (2) (2013).[9] The victim's belief in her impending death may be inferred from the character of the injury. Commonwealth v. Key, 381 Mass. 19, 25 (1980). The judge, and then the jury, must both determine whether the requirements for admission have been met by a preponderance of the evidence. Commonwealth v. Nesbitt, 452 Mass. 236, 251 n.16 (2008), quoting Key, 381 Mass. at 22.[10]

The evidence was more than sufficient to support the judge's finding that the victim's statements met this evidentiary standard. When the victim made the statements, she had been stabbed eight times, and four of her wounds were independently life threatening. The wounds penetrated the victim's lung and spleen, causing profuse bleeding and affecting

---

[9] The admission of a dying declaration does not implicate the defendant's constitutional right to confrontation. Commonwealth v. Nesbitt, 452 Mass. 236, 249-251 (2008), quoting Crawford v. Washington, 541 U.S. 36, 56 n.6 (2004). The constitutional right "is most naturally read as a reference to the right of confrontation at common law," Crawford, supra at 54, and the dying declaration was recognized at common law as an exception to the right of confrontation when the Sixth Amendment to the United States Constitution was adopted. Id. at 56 & n.6. See Nesbitt, supra at 250.

[10] The judge in this case instructed the jury that they could consider this evidence only if they were to find that the statements met the requirements for dying declarations by a preponderance of the evidence.

her breathing.[11]  The victim was pale and distraught, and seemingly in pain.  At the apartment, the victim pleaded, "I don't want to die," and, "Please don't let me die," which she repeated multiple times.  In the ambulance, the paramedics noted that the victim had no palpable blood pressure.  In persuading her to allow the insertion of an IV, a paramedic informed her that she was "very sick."  She made the declarations regarding who "did this to [her]" in the ambulance, and died less than five hours later.  See Middlemiss, supra at 632; Nesbitt, supra at 252.

The defendant acknowledges that the admission of the victim's statements is consistent with the standard articulated in our decisions in Middlemiss, 465 Mass. at 631-632 and Nesbitt, 452 Mass. at 251-252, but urges us to adhere to the stricter requirements of older cases, where we held that a dying declaration was not admissible "unless all hope of recovery has gone from the mind of the declarant, and [s]he speaks under a sense of impending death."  Commonwealth v. Polian, 288 Mass. 494, 497 (1934), and cases cited.  We decline to adopt the defendant's proposed test.  The current standard appropriately ensures that admission of the dying declaration is necessary (because it requires that the declarant has died) and that the

---

[11] The medical examiner testified that, by the time of her death, the victim had lost approximately 1.2 liters of blood.

statement is trustworthy (because it requires that the declarant fear that death is imminent). See, e.g., M.S. Brodin & M. Avery, Massachusetts Evidence § 8.4.1 at 491 (8th ed. 2007). The judge did not err in admitting the victim's statements as dying declarations.

4. Prior bad acts. At trial, the Commonwealth elicited evidence of prior bad acts from two witnesses. First, the victim's mother testified that she twice heard the victim tell the defendant to stop drinking, and that, a few days before the victim was killed, she saw the defendant pull the victim's arm after she told him that he should leave before he got drunk. After defense counsel objected to the testimony, the judge instructed the jury that the evidence was admitted for the sole purpose of establishing the defendant's state of mind and the relationship between the defendant and the victim. In addition, the taxicab driver, who had driven the defendant and the victim on multiple occasions, testified over objection that, a few months before her death, the victim said that she was expecting a baby and would take it to Puerto Rico if the defendant did not "do right."[12]

The defendant argues that this evidence was too remote to rationally prove any issue at trial, and unduly prejudicial to

[12] The taxicab driver later told the defendant that the victim's threat was not serious, and she had said it just to worry him. The victim's autopsy revealed no signs of a pregnancy.

the defendant.  "While evidence of the defendant's prior bad acts is not admissible to show bad character or propensity to commit a crime, . . . such evidence is admissible if relevant to show the defendant's motive, intent, or state of mind." (Citations omitted.)  Beneche, 458 Mass. at 80.  "To be sufficiently probative the evidence must be connected with the facts of the case [and] not be too remote in time." Commonwealth v. Butler, 445 Mass. 568, 574 (2005), quoting Commonwealth v. Barrett, 418 Mass. 788, 794 (1994).  The judge also must find that the probative value of the evidence in question outweighs undue prejudice to the defendant.  Butler, supra, quoting Barrett, supra.  We uphold a judge's decision to admit prior bad acts absent an abuse of discretion. Commonwealth v. Sharpe, 454 Mass. 135, 143 (2009), citing Commonwealth v. Valentin, 420 Mass. 263, 270 (1995).

The evidence reflecting the victim's prior dissatisfaction with the defendant's drinking illustrated the nature of their relationship and suggested a motive for the killing:  conflict about his excessive drinking.  See Commonwealth v. Bradshaw, 385 Mass. 244, 269-270 (1982) ("prosecution [is] entitled to present as full a picture as possible of the events surrounding the incident itself" lest murder appear "as an essentially inexplicable act of violence").  Where the evidence was

accompanied by the judge's limiting instruction, we find no error in its admission.

We do not, however, see the relevance of the victim's musing about returning to Puerto Rico if she had a baby and the defendant did not "do right," where there was no evidence that the victim was pregnant when she was killed or that there was discussion on the night of the killing about the possibility of her return to Puerto Rico.  But we also see no risk of prejudice to the defendant arising from its admission, where it was not clear what the victim meant by "do right," and where there was no suggestion that the defendant had abused the victim or wished to shirk his obligations if he were to father a child with the victim.  If it were error to admit this testimony, it was not prejudicial error.

5.  Jury instructions regarding intoxication.  At the close of the evidence, the judge instructed the jury on the elements of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty, as well as the lesser included offenses of murder in the second degree and manslaughter.  The judge gave the following instruction on intoxication after explaining murder in the first degree and its lesser included offenses:  "In determining whether the Commonwealth has proved beyond a reasonable doubt the defendant's intent to commit the offenses I have just defined

for you, you should consider all credible evidence relevant to the defendant's intent, including any credible evidence of the effect of drug or alcohol impairment on the defendant."  The judge did not instruct the jury that they could consider any credible evidence of the defendant's consumption of alcohol in determining whether the defendant committed the killing with extreme atrocity or cruelty, an instruction that in substance is required where there is evidence that the defendant was under the influence of alcohol at the time of the killing.  See Commonwealth v. Rutkowski, 459 Mass. 794, 798 (2011) ("It should have been made clear to the jury that they could consider evidence of mental impairment on the specific question whether the murder was committed with extreme atrocity or cruelty"); Commonwealth v. Perry, 385 Mass. 639, 648-649 (1982) (jury must be instructed that they may consider defendant's intoxication in determining whether killing was committed with extreme atrocity or cruelty).  See also Model Jury Instructions on Homicide 61-62 (1999) & 49 (rev. 2013).  The defendant did not request such an instruction or object to its absence.  Where the only theory of murder in the first degree on which the jury found the defendant guilty was extreme atrocity or cruelty, the defendant on appeal argues that the absence of such an instruction was error that created a substantial likelihood of a miscarriage of justice.

The absence of such an instruction was error.  See
Rutkowski, 459 Mass. at 797-799; Commonwealth v. McDermott, 393
Mass. 451, 457-459 (1984).  There was sufficient evidence of the
defendant's intoxication at the time of the killing to warrant
the instruction, and the instruction that was given regarding
alcohol impairment was limited to consideration of the
defendant's intent.  "Intent and knowledge are not aspects of
extreme atrocity or cruelty."  Rutkowski, supra at 797-798.[13]
Therefore, the judge's instructions on intoxication would have
been understood by the jury to relate only to the elements of
premeditation and malice, and not to whether the defendant acted
with extreme atrocity or cruelty.

We turn now to whether the error in the jury instructions
created a substantial likelihood of a miscarriage of justice.
The Commonwealth contends that there was no substantial
likelihood because its theory of extreme atrocity or cruelty
focused on the number of stab wounds the defendant inflicted on
the victim and her degree of suffering, and these Cunneen

---

[13] "The Commonwealth need not prove that the extreme
atrocity or cruelty was premeditated, . . . that the defendant
intended to inflict extraordinary pain, . . . or that she knew
that her acts were extremely atrocious or cruel" (citations
omitted).  Commonwealth v. Rutkowski, 459 Mass. 794, 798 n.3
(2011).

factors would not be affected by the defendant's intoxication.[14] This overlooks the rationale for the jury instruction, which is that "the jury should reflect the community's conscience in determining what constitutes an extremely cruel or atrocious killing." McDermott, 393 Mass. at 458. "In that role, the jury must take a defendant's intoxication into account when evaluating cruelty or atrocity aside from any issue of intent." Id. at 458-459. See Perry, 385 Mass. at 649, quoting Commonwealth v. Gould, 380 Mass. 672, 686 (1980) ("Consideration of the defendant's impaired capacity as well as the character of his acts is essential if the jury [is] to serve fully and fairly as the community's conscience in separating extreme atrocity or cruelty from that atrocity or cruelty inevitably included in the destruction of any human life").

Here, there was strong evidence of the defendant's intoxication at the time of the killing, and defense counsel in closing argument told the jury that "the consumption of alcohol that night could be key; it could be major." But the jury instruction on intoxication "effectively removed what may have

---

[14] The Cunneen factors are: the defendant's indifference to or pleasure in the victim's suffering, the victim's consciousness and degree of suffering, the extent of the victim's physical injuries, the number of blows delivered by the defendant, the manner and force with which the defendant delivered the blows, the weapon or weapons used by the defendant, and the disproportion between the means needed to cause death and the means used by the defendant. Commonwealth v. Cunneen, 389 Mass. 216, 227 (1983).

been [his] only viable defense to the question of extreme atrocity or cruelty." Rutkowski, 459 Mass. at 799. Where the jury did not find the defendant guilty on the theory of deliberate premeditation, where the defendant was the first to telephone 911 after the stabbing, and where there was no evidence of a history of domestic abuse, we cannot say that "we are substantially confident that, if the error had not been made, the jury verdict would have been the same." Ruddock, 428 Mass. at 292 n.3. See Rutkowski, supra, citing Commonwealth v. Wright, 411 Mass. 678, 682 (1992) ("[w]e cannot say that this error did not likely influence the jury's verdict"). We, therefore, vacate the verdict of murder in the first degree. Because the error affected only the jury's finding regarding the element of extreme atrocity or cruelty, and did not affect the jury's finding regarding the elements of murder in the second degree, the Commonwealth shall have the option of either proceeding with a new trial on the murder indictment or accepting a reduction of the verdict to murder in the second degree.

6. Relief pursuant to G. L. c. 278, § 33E. We have considered the entire record pursuant to our obligation under G. L. c. 278, § 33E. With the exception of the jury instruction, discussed above, there was no error that created a substantial likelihood of a miscarriage of justice.

Conclusion.  The defendant's conviction of murder in the first degree on the theory of extreme atrocity and cruelty is vacated.  The Commonwealth shall have the option of either proceeding with a new trial on the murder indictment or accepting a reduction of the verdict to murder in the second degree.  Within fourteen days of the issuance of this opinion, the Commonwealth shall inform this court whether it will move to have the defendant sentenced on the lesser offense of murder in the second degree or whether it will retry the defendant for murder in the first degree.  See Rutkowski, 459 Mass. at 800.  We will issue an appropriate rescript to the Superior Court after the Commonwealth informs us of its decision.

So ordered.