NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13225

COMMONWEALTH  vs.  LAZARO MIRANDA.


Suffolk.     December 9, 2022. - June 26, 2023.

Present:  Budd, C.J., Lowy, Cypher, Kafker, & Georges, JJ.


Homicide.  Evidence, State of mind, Intoxication.  Mental
    Impairment.  Intoxication.  Practice, Criminal, Capital
    case, Instructions to jury, State of mind, New trial,
    Transcript of evidence, Record, Stipulation.



Indictment found and returned in the Superior Court
Department on February 12, 1998.

The case was tried before Charles T. Spurlock, J., and a
motion for a new trial, filed on July 30, 2012, was heard by
Jeffrey A. Locke, J.


Brian J. Kelly for the defendant.
Elisabeth Martino, Assistant District Attorney, for the
Commonwealth.


KAFKER, J.  A jury found the defendant, Lazaro Miranda,

guilty of murder in the first degree on the theory of extreme

atrocity or cruelty for the death of twenty-seven year old Lisa

McLester (victim).  She died from multiple chop wounds from a

machete.  No dispute existed at trial as to the defendant's actions causing the victim's death.  At issue, however, was the defendant's state of mind at the time of the murder.  The defendant appeals from his conviction and from the denial of his motion for a new trial.

On direct appeal, the defendant argues that the trial judge erred by not providing two instructions to the jury regarding mitigating circumstances despite trial counsel's objections.  The trial judge did not instruct on sudden combat in his voluntary manslaughter instruction, nor did he specifically instruct on the defendant's mental impairment and intoxication in his instruction on murder in the first degree under a theory of extreme atrocity or cruelty.  He did, however, provide a general instruction on intoxication and mental impairment negating knowledge or intent.

Appealing from the denial of the motion for a new trial, the defendant argues that the judge who heard that motion (motion judge) erred in not granting a new trial because the defendant was unfairly prejudiced by the motion judge's reliance on a stipulated summary of a missing trial transcript from the day of trial that included the jury instructions.  Finally, the defendant asserts that he is entitled to a new trial or a reduced conviction to either murder in the second degree or voluntary manslaughter, pursuant to G. L. c. 278, § 33E.

We conclude that the trial judge did not err by omitting the defendant's requested instructions on sudden combat, but erred when he failed to instruct on the impact of mental impairment and intoxication on whether the defendant acted in a cruel or atrocious manner. This error created a substantial likelihood of a miscarriage of justice. Commonwealth v. Denson, 489 Mass. 138, 144 (2022). See Commonwealth v. Rutkowski, 459 Mass. 794, 799 (2011). We therefore vacate the conviction of murder in the first degree and remand for further proceedings in which "the Commonwealth has the option of moving to have the defendant sentenced on the lesser included offense of murder in the second degree or of retrying the defendant for murder on the theory of extreme atrocity or cruelty." Id. at 800.

1. Background. a. Facts. We summarize the facts that the jury could have found at the defendant's trial, reserving certain details for our discussion of the legal issues.

On the evening of December 29, 1997, Anna French was reading the newspaper in her first-floor unit in an apartment complex on Seaver Street in Boston. Between 7 P.M. and 7:15 P.M., she overheard two loud "thumps" coming from a bedroom in the apartment above hers, where the victim lived with the defendant and a four year old child. She heard male and female voices, including a man yelling repeatedly, "Who are you fucking?" She also heard the child crying.

Shortly thereafter, French heard the same voices in the first-floor hallway outside her apartment. The man said, "I'm going to kill you. Bitch, you're not dead yet? You're still breathing?" French also heard a repeated "swoosh sound, like something was swinging." She entered the hallway and saw the defendant, whom she recognized as the man who lived in the apartment above hers. Seeing French, the defendant said, "Bitch, you'd better go back in the house before I kill you, too," causing her to run back inside her apartment and lock her door. She called 911 at 7:45 P.M. While she waited for police, she heard someone "running on the stairs" and leaving the building.

Boston police arrived at 7:48 P.M and found the victim unresponsive at the base of the stairs on the first floor. Blood had pooled in the foyer and at the stairwell and spattered the walls and stairs. Emergency personnel transported the victim to a local hospital, where she was pronounced dead, having suffered multiple chop wounds to the head, resulting in several skull fractures, as well as similar wounds to the upper body. At the apartment complex, investigators recovered four pieces of black plastic from the building's foyer and a sheathed machete from behind a bedroom door in the victim's apartment. Police did not detect within the apartment any evidence of blood, a struggle, or the consumption of alcohol.

Later that evening, police composed a photographic array that included the defendant's photograph. From that array, French identified the defendant as "the man she saw in the hallway of the apartment building" earlier in the evening, who "lived upstairs with" the victim. Officers began searching for the defendant at various addresses throughout Boston. At 12:20 A.M. on December 30, 1997, police apprehended the defendant, who was walking down Edinboro Street, carrying a sheathed machete with a broken handle. Officers recited to him the Miranda rights both prior to putting him in the back of a police cruiser and again after securing him in the vehicle.

At first, the defendant asked the officers, "Is she dead?" Despite an admonishment not to talk, the defendant declared, "[S]he shouldn't have been fucking around. I told her about fucking around. I'm deadly." En route to Boston police headquarters, the defendant continued to inquire, unprompted, about the victim's physical condition. To the officers, the defendant seemed calm and in good physical condition and did not appear intoxicated or impaired.

After arriving at police headquarters, the defendant waived his Miranda rights, and a homicide sergeant detective interviewed him, first off tape and then tape recorded. During the tape recorded interview, the defendant said that he was suspicious that the victim had been unfaithful to him. Although

he denied arguing with the victim, when asked whether "she ma[d]e a move for" a machete found in the bedroom, the defendant responded, "Yes, she did."  When asked "if he was in fear of his life," he also replied in the affirmative.  Nevertheless, the defendant "refused to enter into any specificity surrounding the number of times [the victim] was struck or specificity as to how she obtained her injuries," but did "tak[e] responsibility for what occurred" and told the detective that "he should have the death penalty" for his actions.  At no point did the interviewing detective have the impression that the defendant was under the influence of alcohol or other drugs, and he did not appear intoxicated or impaired while at the police station.

The Boston police crime laboratory conducted forensic testing on the machete confiscated from the defendant at the time of his arrest.  The machete and its sheath tested positive for human blood.  Forensic deoxyribonucleic acid (DNA) analysis of the blood on the machete blade, and blood from the apartment complex entryway, matched the victim's DNA profile.[1]  The pieces of plastic recovered from the entryway of the apartment building also matched the broken handle of the machete.  Furthermore, following an autopsy, the medical examiner determined that the

---

[1] The director of the crime laboratory testified that the odds of such a match occurring in randomly selected unrelated individuals were between one in 5.9 million and one in 190 million.

victim's injuries were consistent with wounds made by a machete and that "she died of multiple chop wounds to the head."

b. Procedural history. A grand jury indicted the defendant on one count of murder in the first degree. Prior to trial, the defendant filed a notice of an intent to rely on a defense of a lack of criminal responsibility or diminished capacity due to mental disease or defect. After a trial in November of 2000, a jury convicted the defendant of murder in the first degree on a theory of extreme atrocity or cruelty. The judge sentenced the defendant to life in prison without the possibility of parole, and the defendant timely appealed. His appeal stalled for several years, however, pending the filing of three days of trial court transcripts, one of which was never recovered.

In response, in 2012, the defendant filed a motion for a new trial or, in the alternative, for a hearing pursuant to Commonwealth v. Harris, 376 Mass. 74 (1978), to address the missing trial transcript for the appellate record. After supervising the Harris reconstruction of the missing trial transcript, and participating in an evidentiary hearing, the parties were able to stipulate to facts recreating the substance of the missing transcript, which included testimony from one of the defendant's expert psychologist witnesses, the charge conference, the closing arguments, the jury instructions, and

the verdict.  Equipped with the reconstructed record, the motion judge ultimately denied the defendant's motion for a new trial in 2015.

The defendant's appeal from that denial was consolidated with his direct appeal from his conviction.  We requested supplemental briefing to address the reconstruction of certain jury instructions given at trial, particularly the general instruction on intoxication and mental impairment.

2.  Discussion.  We review "a direct appeal from a conviction of murder in the first degree along with an appeal from the denial of a motion for a new trial" together under G. L. c. 278, § 33E.  Denson, 489 Mass. at 144.  "In so doing, we review 'preserved issues according to their constitutional or common-law standard and any unraised, unpreserved, or unargued errors, and other errors we discover after a comprehensive review of the entire record, for a substantial likelihood of a miscarriage of justice.'"  Id., quoting Commonwealth v. Upton, 484 Mass. 155, 160 (2020).

The defendant argues that the trial judge committed reversible error by failing to give the jury two instructions on mitigating circumstances.  He also argues that the motion judge erred by denying his motion for a new trial and that he is entitled to a new trial because he is prejudiced on direct appeal by the reliance on a stipulated summary of a missing

trial transcript that encompasses the trial judge's errant jury instructions.  The defendant also asks this court to order a new trial or reduce the verdict pursuant to G. L. c. 278, § 33E.  We address each issue in turn.

a.  <u>Jury instructions</u>.  Per the parties' stipulation to the trial events of November 15, 2000, the trial judge instructed the jury on murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty, murder in the second degree, voluntary manslaughter, and self-defense.[2] The parties agree that the judge used the model jury instructions in operation at the time of trial.[3]

The defendant argues that he is entitled to a new trial because the trial judge erred by declining to instruct the jury on voluntary manslaughter under a theory of sudden combat, and on the combined effects of mental impairment from mental illness and intoxication negating the intent or knowledge required for murder in the first degree under a theory of extreme atrocity or cruelty, which would have warranted a lesser conviction of murder in the second degree.

---

[2] The judge also specifically instructed on third prong malice for murder in the first and second degrees, to which the defendant objected but was overruled.

[3] Model Jury Instructions on Homicide (1999).

i. <u>Voluntary manslaughter arising from sudden combat</u>. The defendant asserts that he was entitled to a jury instruction on sudden combat because, considering the facts in the light most favorable to him, the victim reached for the machete in the bedroom, causing the defendant to fear for his life, given that "the victim had swung her machete at him on at least one prior occasion and . . . cut him before." She then swung this machete "at him a couple times, but did not touch him with it," before the defendant grabbed the other machete and chased her downstairs with it. After the confrontation that resulted in her death, he immediately left the building. The defendant requested, and then objected to the omission of, the sudden combat instruction,[4] and so we review for prejudicial error, Commonwealth v. Gallett, 481 Mass. 662, 678 (2019), by "inquir[ing] whether there is a reasonable possibility that the error might have contributed to the jury's verdict" (citation omitted), Commonwealth v. Odgren, 483 Mass. 41, 46 (2019).

"Voluntary manslaughter is an unlawful killing arising not from malice, but from . . . sudden [heat of] passion induced by reasonable provocation, <u>sudden combat</u>, or [the use of] excessive force in self-defense" (emphasis added; quotation and citation

---

[4] The defendant's objection to the sudden combat instruction appears in the stipulation, which we accept as true, thereby preserving the issue on appeal.

omitted).  Commonwealth v. Richards, 485 Mass. 896, 918 (2020).
"In deciding whether an instruction is warranted regarding these
mitigating circumstances, the evidence must be viewed in the
light most favorable to the defendant."  Id., citing
Commonwealth v. Acevedo, 446 Mass. 435, 443 (2006).  Here, the
trial judge instructed the jury on theories of reasonable
provocation and excessive force in self-defense but not on
sudden combat, which the defendant had requested.[5]  Having viewed
the evidence "in the light most favorable to the defendant,"
Richards, supra, we conclude that the trial judge did not err by
not giving the sudden combat instruction.

Consistent with more than one and one-half centuries of our
jurisprudence, sudden combat entails two persons "meet[ing], not
intending to quarrel, and angry words suddenly arise," leading
to "blows . . . on both sides, without much regard to who is the
assailant."  Commonwealth v. Howard, 479 Mass. 52, 58 (2018),

---

[5] In their briefs, the parties frequently conflate
reasonable provocation with sudden combat or merge the two into
one instruction ("reasonable provocation by sudden combat") when
they are two separate but related instructions, as we discuss
infra.  "Reasonable provocation encompasses a wider range of
circumstances likely to cause an individual to lose self-control
in the heat of passion than does sudden combat. . . .  Thus, it
is more accurate to view sudden combat as a form of reasonable
provocation."  Commonwealth v. Howard, 479 Mass. 52, 58 (2018).
See Richards, 485 Mass. at 919-920 (concluding that trial judge
erred in not offering reasonable provocation instruction when
victim stabbed defendant in chest, and thus, not needing to
reach question whether sudden combat instruction was also
required).

quoting Commonwealth v. Webster, 5 Cush. 295, 308 (1850). The victim making physical contact with the defendant is necessary, but not sufficient, for a sudden combat instruction. Howard, supra at 58-59 & n.7 (2018) (citing several cases). Even when the victim attacks or "strike[s] a blow against the defendant," however, such contact is not always enough to warrant the instruction. Id. at 58, quoting Commonwealth v. Espada, 450 Mass. 687, 697 (2008).

Regardless of the theory evoked, a voluntary "manslaughter instruction is not warranted when the defendant 'cooled off' and 'regained a measure of self-control' before attacking the victim (citation omitted)," Commonwealth v. Barbosa, 463 Mass. 116, 136 (2012), or where the defendant and victim are separated for a few minutes following the provocation "and then the defendant seeks out the victim (citation omitted)," id. at 136-137. Both reasonable provocation and sudden combat instructions require evidence that

> "raises a reasonable doubt that something happened which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened actually did produce such a state of mind in the defendant" (quotation and citation omitted).

Richards, 485 Mass. at 918 (reasonable provocation). Accord Commonwealth v. Walden, 380 Mass. 724, 728 (1980) (sudden combat).

First and foremost, the defendant admitted that the victim struck no blow against him; he had no physical injuries whatsoever.  Cf. Howard, 479 Mass. at 58-59 & n.7.  Secondly, although the conflict began in the apartment, the defendant chased the victim into the common hallway of the apartment building and downstairs into the foyer, where she was killed, leaving him ample time to regain a measure of self-control.  See Richards, 485 Mass. at 919; Barbosa, 463 Mass. at 136.  Indeed, the victim's machete was found sheathed behind a bedroom door. We therefore discern no error in rejecting a sudden combat instruction.

ii.  Mental impairment and intoxication.  Our evaluation of the adequacy of the jury instructions on mental impairment and the effects of the consumption of alcohol is complicated by the missing transcript, which included testimony from one of the defendant's key mental health experts, as well as the jury instructions themselves.  We have at our disposal the joint stipulation of the parties; the proposed jury instructions submitted by each party, with annotations, where trial counsel "checked off" what the trial judge delivered and noted certain omissions or objections; and transcripts from the 2015 evidentiary hearing and status conference at which appellate counsel discussed transcript reconstruction efforts with the

motion judge. We have also requested, and have been provided, supplemental briefing.

Based on this information, we know that the judge relied on the 1999 model jury instructions, in effect at the time of the defendant's 2000 trial, when he gave an instruction. We also know that the trial judge properly instructed on lack of criminal responsibility due to mental disease or defect. Furthermore, in his instruction on murder in the first degree under a theory of deliberate premeditation, he instructed as follows:

> "In determining whether the Commonwealth has proven beyond a reasonable doubt that the defendant acted with deliberate premeditation and that he specifically intended to kill [the victim], you should consider all the credible evidence relevant to deliberate premeditation and intent to kill, including any credible evidence of the defendant's alleged mental impairment on the day in question" (emphasis added).

There is also no dispute that the judge gave a "general instruction on intoxication" as it relates to proof of knowledge and intent.

What persists are two distinct issues: first, whether the judge, when he gave a "general instruction on intoxication," as framed in the stipulation, also instructed on mental impairment; and second, whether the judge gave an instruction on mental impairment and intoxication specific to murder in the first degree under the theory of extreme atrocity or cruelty.

A.  <u>Supplemental instruction on mental impairment negating knowledge and intent</u>.  The 1999 model jury instructions provide for a supplemental instruction regarding mental impairment and intoxication as it applies to proof of knowledge or intent.

> "Whenever the Commonwealth must prove the defendant's intention to do something, you should consider any credible evidence of [mental impairment] [the effect on the defendant of his consumption of (alcohol) (drugs) (alcohol and other drugs)] in determining whether the Commonwealth has met its burden of proof.  Likewise, whenever the Commonwealth must prove the defendant's knowledge of any facts or circumstances, you should consider any credible evidence of [mental impairment] [the effect on the defendant of his consumption of (alcohol) (drugs) (alcohol and other drugs)] in determining whether the Commonwealth has met its burden of proof."

Model Jury Instructions on Homicide 61-62 (1999).  Based on the representations of the parties in their principal and supplemental briefs, and the record before us, we conclude that the trial judge properly gave the model instruction, employing the language on "mental impairment" and "the effect on the defendant of his consumption of alcohol."

Discussing the general intent instruction, the stipulation notes:

> "The judge did not use the specific language as noted in defense counsel's motion for jury instructions, specifically regarding the jury's consideration of any credible evidence of mental impairment in conjunction with his consumption of alcohol and/or drugs.  Defense counsel had requested said language and objected when said instruction was not given."

Based on all this information, the Commonwealth contends that the judge gave the model instruction, including referencing both mental impairment and the consumption of alcohol, and only declined to incorporate the defendant's specific language about "mental impairment in conjunction with the consumption of alcohol," which sought to add to the jury's consideration the effects of the combination of impairment and intoxication.[6] The defendant, although less than clear, has not challenged this interpretation, but instead focuses on the specific supplemental instruction on extreme atrocity or cruelty, discussed <u>infra</u>.[7] We

---

[6] The defendant requested the following instruction as paragraph fifty-four of his proposed jury instructions:

"Whenever the Commonwealth must prove the defendant's intention to do something, you should consider any credible evidence of mental impairment, the effect on the defendant of his consumption of alcohol, drugs, or alcohol and other drugs, <u>as well as his mental impairment in conjunction with the consumption of alcohol, drugs[,] or alcohol and drugs</u>, in determining whether the Commonwealth has met its burden of proof. Likewise, whenever the Commonwealth must prove the defendant's knowledge of any facts or circumstances, you should consider any credible evidence of mental impairment, the effect on the defendant of his consumption of alcohol, drugs, or alcohol and other drugs in determining whether the Commonwealth has met its burden of proof." (Emphasis added.)

This paragraph was not checked off, indicating that it was not given, and it includes a handwritten annotation about an objection, which was denied, next to the second sentence of the proposed instruction, which was underlined.

[7] At oral argument, the defendant clarified his position on asserting that the judge erred in failing to give a mental

conclude that the judge gave the general instruction, including the language on mental impairment, and need not have given the defendant's requested instruction regarding the combination of mental impairment and intoxication, as the defendant did not present evidence on such combined effects.

"A judge is not required to give jury instructions in the exact manner requested by the defendant provided that the requested instruction is adequately covered."  Commonwealth v. Walker, 466 Mass. 268, 284 (2013).  Because the judge generally gave the model instructions, and the issue of the defendant's mental health was front and center at trial, we conclude that the Commonwealth's reading is supported by the record in the instant case.  We also conclude that, because the expert evidence primarily focused on the defendant's mental illness and did not address the effects of alcohol on the defendant's mental illness, as specifically requested by the defendant, the supplemental instruction on mental impairment and intoxication was sufficient as to general knowledge or intent.

"To be entitled to an instruction on mental impairment, a defendant must, at a minimum, introduce evidence that such impairment existed at the time of the conduct in question."  Commonwealth v. Santiago (No. 2), 485 Mass. 416, 426-427 (2020),

_____

impairment and intoxication instruction to negate extreme atrocity or cruelty.

citing Commonwealth v. Gould, 380 Mass. 672, 680-681 (1980).  As to evidence of mental impairment, the defendant presented testimony from two expert witnesses:  a clinical psychologist, Dr. Stephanie Brody, who conducted four hours of cognitive and personality testing on him several months prior to trial, but more than two years after the murder; and a forensic psychologist, Dr. Ronald Ebert, who examined the defendant on five separate occasions between May of 1998 and June of 2000.

Regarding the defendant's cognitive functioning in April of 2000, Dr. Brody determined that he performed "at a borderline level of intellectual ability," with "significant impairment . . . in concentrating, highly concrete thought process, and . . . significant psycho-motor slowing."  She also thought that, based on indications of disorganized thinking, he may be suffering from major depression, but, regardless, his cognitive abilities had been persistently below average on these metrics that remained stable over time.

With regard to the defendant's personality profile, Dr. Brody testified to evidence of "psychotic depression," marked by "intense [dysphoria], mood shifts," as well as "problems with concentration" and "managing and coping with intrusive

thoughts."[8]  She also noted that the defendant "ha[d] difficulty controlling the experience of emotion," known as "eruption of affect," during testing.  Nevertheless, she noted that she had "no knowledge . . . of how [the defendant] was functioning prior to" her testing him in April of 2000, or thereafter.  Dr. Brody also presented no testimony regarding the effects of alcohol on the defendant's mental illness.  In fact, she testified that she had "no personal knowledge as to whether the defendant abused alcohol," including on the night of the victim's death.

It was Dr. Ebert's opinion that the defendant suffered from major depression with psychotic features and that such illness was present at the time of the murder.  As recounted in the stipulation, he determined that,

> "[a]lthough [the defendant] has not offered significant details of his mental state during the incident to his examiner, his description (and that of others) of his drinking and his depression in the time immediately preceding the event raises significant question concerning his capacity to conform his conduct to the requirements of the law at the time of the incident due to the existence of both a mental disease (depression) and a mental defect (effects of alcoholism)" (emphases added).

---

[8] The defendant's mother also testified that, prior to the killing, the defendant had problems sleeping and was "hearing things," and that he seemed "very depressed" to her.

The defendant also told Dr. Ebert that he had "been drinking heavily during the day of the killing."[9]  Dr. Ebert concluded that the defendant's "psychological state and his intoxication very likely interfered with the normal functioning of his mind at that time," including "that his ability to plan and premeditate his actions would have been severely impaired at that time."[10]

Viewed in the light most favorable to the defendant, Richards, 485 Mass. at 918, this evidence described the defendant as suffering from mental disease -- major depression with psychotic features -- and mental defect -- effects of alcoholism -- while also drinking alcohol on the night of the killing but did not address how the defendant's purported intoxication on that day would have affected his mental disease or defect.  As given by the trial judge, the model supplemental instruction on mental impairment and intoxication as to general knowledge or intent tracked the evidence.  The jury were free to

---

[9] In further support of the defendant's contention that he was under the influence of alcohol at the time of the killing, the defendant called his stepfather and mother as lay witnesses. They testified that, at around the time of the murder, the defendant drank alcohol routinely.  His stepfather further testified that, when he saw the defendant after the killing that same night, the defendant's breath smelled of alcohol.

[10] Dr. Ebert believed that the defendant presented signs of "organic damage secondary to substance abuse" supporting "evidence of mental illness of psychotic proportions."

consider mental impairment or intoxication and were not precluded from considering both. The trial judge was not, however, required to instruct on the combined effect as there was no expert testimony in this regard. We discern no error.

B. Mental impairment and intoxication affecting extreme atrocity or cruelty. Per the stipulation, the trial judge "instructed the jury on murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty," as well as murder in the second degree, using the model instructions. Based on the Commonwealth's proposed instructions for murder in the first degree, all of which were checked off as having been given, and the parties' representations in their briefs, the trial judge instructed on mental impairment as to the defendant acting with deliberate premeditation:

> "In determining whether the Commonwealth has proven beyond a reasonable doubt that the defendant acted with deliberate premeditation and that he specifically intended to kill [the victim], you should consider all the credible evidence relevant to deliberate premeditation and intent to kill, including any credible evidence of the defendant's alleged mental impairment on the day in question" (emphasis added).

The supplemental instructions in effect in 1999 also included similar language regarding "[Whether the defendant acted in a cruel or atrocious manner in causing the death of the deceased]" (emphasis added). Model Jury Instructions on Homicide 62

(1999).  This instruction, we conclude, was not given, for the reasons stated infra.

Paragraph fifty-five of the defendant's requested instructions included the relevant language.  Neither party contends that the trial judge gave this supplemental instruction regarding whether the defendant acted in a cruel or atrocious manner, nor is there any indication, in the stipulation or supplemental briefing, that the defendant objected to the failure to give this instruction regarding murder in an extremely cruel or atrocious manner.[11]

The defendant argues, in his principal and supplemental briefs, that the trial judge committed a reversible error by not instructing the jury on the defendant's alleged mental impairment and intoxication to negate the intent or knowledge required for a finding of murder in the first degree under a theory of extreme atrocity or cruelty.  In response to this argument, the Commonwealth points only to the defendant's

---

[11] Where the stipulation discusses the defendant's objections to the omission of jury instructions, the stipulation cites to paragraphs fifty-four, which contains the defendant's requested language on the combined effects of mental impairment and alcohol, and fifty-six, which provides:  "I reiterate, whenever the Commonwealth must prove that the defendant intended to do something, or had knowledge of certain facts or circumstances, in order to prove the crime, you may consider any credible evidence of mental impairment, the consumption of alcohol, drugs or alcohol and drugs in determining whether the Commonwealth has met its burden of proving the defendant's intent or knowledge."

objection, as noted in the stipulation and annotations to his proposed jury instructions, to the trial judge not instructing using the language he requested on the combined effects of mental impairment and intoxication, an issue we addressed supra. The Commonwealth provides nothing affirmatively suggesting that the judge gave the instruction.

We read the record, including the stipulation, and supplemental briefing as demonstrating that the judge gave a general instruction on mental impairment and intoxication as to intent and knowledge, but did not give the defendant's requested supplemental instruction on mental impairment and intoxication negating whether he acted in an extremely cruel or atrocious manner, and that the defendant did not object to the omission of this supplemental instruction. Because the defendant did not object, we review this unpreserved issue "for a substantial likelihood of a miscarriage of justice" (quotations omitted). Denson, 489 Mass. at 144, quoting Upton, 484 Mass. at 160. "For an error to have created a substantial likelihood of a miscarriage of justice, it must have been 'likely to have influenced the jury's conclusion.'" Upton, supra, quoting Commonwealth v. Goitia, 480 Mass. 763, 768 (2018). Accord Rutkowski, 459 Mass. at 799.

When warranted by the evidence, we have long required a mental impairment instruction specific to whether the murder was

committed with extreme atrocity or cruelty -- in addition to, or apart from, that given generally on intent and knowledge. See Rutkowski, 459 Mass. at 798 n.3, 799 (explaining distinction). We have done so even though extreme atrocity or cruelty does not require a finding of intent separate from the malice aforethought required for murder, Commonwealth v. Cunneen, 389 Mass. 216, 227 (1983), modified by Commonwealth v. Castillo, 485 Mass. 852, 865-866 (2020), because mental impairment also relates, in this context, to the jury's function in serving as the "community's conscience," Cunneen, supra at 228, quoting Gould, 380 Mass. at 685. To understand this requirement and its proper application, we must review several cases decided by this court, beginning with Gould and concluding with Commonwealth v. Gonzalez, 469 Mass. 410 (2014).

As the court in Gould, 380 Mass. at 685, explained: "It is the teaching of our cases that the jurors 'as the repository of the community's conscience, [must] determine when the mode of inflicting death is so shocking as to amount to extreme atrocity or cruelty" (citation omitted). This is because mental impairment "bears on personal turpitude, and the law, if it is to maintain the community's respect, must grade its condemnation according to the moral turpitude of the offender as the community evaluates it" (quotation and citation omitted). Id. at 686. More specifically, "if a malicious mind may be

considered as evidence that a defendant committed a murder with extreme atrocity or cruelty, then fairness requires that an impaired mind may also be considered as evidence" on this same question.  Id. at 684-685.  As they are acting as the conscience of the community in deciding whether a murder was committed with extreme atrocity or cruelty, the jury should, therefore, be instructed to consider evidence of mental impairment on the specific question of extreme atrocity or cruelty.  Id. at 685-686.[12]

We further clarified this requirement, and the analysis underlying it, in Cunneen.  We began by explaining that "[w]e adhere to our view that proof of malice aforethought is the only requisite mental intent for a conviction of murder in the first degree based on murder committed with extreme atrocity or cruelty."  Cunneen, 389 Mass. at 227.  Then, after "delineat[ing] a number of factors which a jury can consider in deciding whether a murder was committed with extreme atrocity or cruelty," id.,[13] we confirmed that Gould also established that "a

---

[12] We applied our reasoning on mental impairment in Gould to the jury's consideration of evidence of the defendant's intoxication as to extreme atrocity or cruelty in Commonwealth v. Perry, 385 Mass. 639, 648-649 (1982), S.C., 424 Mass. 1019 (1997).

[13] In Cunneen, 389 Mass. at 227, we listed the factors as including "indifference to or taking pleasure in the victim's suffering, consciousness and degree of suffering of the victim,

defendant's impaired mental capacity is an additional factor which the jury should consider in determining whether the murder was committed with extreme atrocity or cruelty," id. at 228. We again specifically referenced in our reasoning the jury's responsibility to reflect "the community's conscience, goals, and norms" in this determination. Id., quoting Gould, 380 Mass. at 685.

We reiterated this reasoning in Commonwealth v. Oliveira, 445 Mass. 837, 846-847 (2006), after our approval of and recommendation to use the 1999 model jury instructions on homicide that are at issue in this case. In so doing, we

---

extent of physical injuries, number of blows, manner and force with which delivered, instrument employed, and disproportion between the means needed to cause death and those employed." We modified the so-called Cunneen factors in our recent decision, Castillo, 485 Mass. at 865-866. There, we concluded that, "[t]o find that the Commonwealth has proved beyond a reasonable doubt that a defendant caused the death of the deceased with extreme atrocity or cruelty, future juries must consider the following three evidentiary factors": "whether the defendant was indifferent to or took pleasure in the suffering of the deceased"; "whether the defendant's method or means of killing the deceased was reasonably likely to substantially increase or prolong the conscious suffering of the deceased"; and "whether the means used by the defendant were excessive and out of proportion to what would be needed to kill a person." Id.

This clarification, designed to prevent a jury from finding "extreme atrocity or cruelty based only on the degree of a victim's suffering," rather than in reference to the "extreme nature of the defendant's conduct," id. at 865, does not change our historical analysis of the purpose and need for the mental impairment instruction for extreme atrocity or cruelty -- to serve as the conscience of the community, as explained supra.

explained that the language of the model jury instructions was "consistent" with Cunneen and its clarification of Gould:

> "[W]hile reduced mental capacity is relevant to the jury's exercise of their broad discretion as a reflection of the community's conscience, there is no greater mens rea required for murder by extreme atrocity or cruelty than there is for murder in the second degree, and the crime does not require that the defendant be aware that his acts were extremely cruel or atrocious."

Id. at 848-849.

All this sheds light on our somewhat abbreviated discussion in Rutkowski.  In that case, the defendant, after "present[ing] expert psychiatric testimony that included," in part, "a review of her long history of mental illness," Rutkowski, 459 Mass. at 796, and her "diagnoses that included psychotic depression," requested an instruction on mental impairment regarding extreme atrocity or cruelty, id. at 797.  The judge, however, "instructed on mental impairment only as it related to intent and knowledge."  Id.  We concluded that this was error.  Id. at 799.

As explained in Rutkowski, and more clearly in its progeny, "there is no greater mens rea required for murder by extreme atrocity or cruelty than there is for murder in the second degree," Oliveira, 445 Mass. at 848, as "[t]he Commonwealth need not prove that . . . the defendant intended to inflict extraordinary pain, or that [he or] she knew that [his or] her acts were extremely atrocious or cruel" (citation omitted),

Rutkowski, 459 Mass. at 798 n.3. Therefore, as the court in Rutkowski held, "It should have been made clear to the jury that they could consider evidence of mental impairment on the specific question whether the murder was committed with extreme atrocity or cruelty." Id. at 798. As it was not, and the "evidence of the defendant's mental impairment [was] significant and . . . a critical aspect of [the] defense, the failure to instruct the jury that they could consider evidence of that impairment on the question of extreme atrocity or cruelty effectively removed what may have been [the] only viable defense to the question of extreme atrocity or cruelty." Id. at 799. The court, therefore, upheld the verdict, but only as to murder in the second degree. Id. at 800.

We found a similar error in Gonzalez. There, "the defendant stabbed his girl friend multiple times" at his apartment "[i]n the early morning hours of February 15, 2009," Gonzalez, 469 Mass. at 411, after an evening of steady drinking, id. at 412, and was convicted of murder in the first degree on a theory of extreme atrocity or cruelty, id. at 411. The jury received instructions on "murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty, as well as the lesser included offenses of murder in the second degree and manslaughter." Id. at 421. The judge also instructed on the impact of intoxication on the defendant's

intent but "did not instruct the jury that they could consider any credible evidence of the defendant's consumption of alcohol in determining whether the defendant committed the killing with extreme atrocity or cruelty." Id., citing Rutkowski, 459 Mass. at 798. Because of the "strong evidence of the defendant's intoxication at the time of the killing," Gonzalez, supra at 423, "[t]he absence of such an instruction was error," even where the jury received the instruction on intent, as "the judge's instructions . . . would have been understood by the jury to relate only to the elements of premeditation and malice, and not to whether the defendant acted with extreme atrocity or cruelty," id. at 422, citing Rutkowski, supra at 797-799.

Given this long line of cases, we conclude that, here, the judge clearly erred in failing to give an instruction on mental impairment as it related to extreme atrocity or cruelty, see Gonzalez, 469 Mass. at 421-422; Rutkowski, 459 Mass. at 797-799, especially considering the "strong evidence," discussed supra, of the defendant's mental impairment on the night of the killing, see Gonzalez, supra at 423.

"We turn now to whether the error in the jury instructions created a substantial likelihood of a miscarriage of justice." Gonzalez, 469 Mass. at 422. There is no doubt that the victim's manner of death -- multiple chop wounds from a machete -- is horrific. In Gonzalez, the Commonwealth argued "that there was

no substantial likelihood" of a miscarriage of justice based on "the number of stab wounds the defendant inflicted on the victim and her degree of suffering," but we concluded that such an argument "overlook[ed] the rationale for the jury instruction." Id. A proper instruction ensures that the jury's verdict "reflect[s] the community's conscience in determining what constitutes an extremely cruel or atrocious killing" (citation omitted). Id. at 422-423. This instruction entitles the jury to take into account the defendant's significant mental impairment, even in brutal murders, and adjust their degree of condemnation based on their consideration of the mental impairment. See Gould, 380 Mass. at 686.

Here, we have another factor to consider. The jury did not convict the defendant of murder in the first degree on the theory of deliberate premeditation where they received a specific instruction to consider mental impairment, but they did convict him on a theory of extreme atrocity or cruelty where such an instruction was omitted. Under these circumstances, in the absence of the required instruction, "we cannot say that 'we are substantially confident that, if the error had not been made, the jury verdict would have been the same'" (citation omitted). Gonzalez, 469 Mass. at 423. See Rutkowski, 459 Mass. at 799 ("We cannot say that this error did not likely influence the jury's verdict"). This error, therefore, created a

substantial likelihood of a miscarriage of justice. See Gonzalez, supra; Rutkowski, supra.

We turn now to the disposition of the defendant's conviction of murder in the first degree. "The distinction between the two degrees of murder is that murder in the first degree is a murder committed with deliberate premeditation, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with imprisonment for life," Commonwealth v. Sires, 413 Mass. 292, 296 n.4 (1992), whereas murder is "the killing of a human being, with malice aforethought," G. L. c. 277, § 39. "Murder which does not appear to be in the first degree is murder in the second degree," G. L. c. 265, § 1, meaning murder in the second degree is a "lesser included offense" of murder in the first degree, see Gonzalez, 469 Mass. at 421; Rutkowski, 459 Mass. at 800.

"Because the error affected only the jury's finding regarding the element of extreme atrocity or cruelty, and did not affect the jury's finding regarding the elements of murder in the second degree," Gonzalez, 469 Mass. at 423, "[w]e discern no error in the jury's verdict as to murder in the second degree," Rutkowski, 459 Mass. at 800. Similarly, in Commonwealth v. Perry, 385 Mass. 639, 649 (1982), S.C., 424 Mass. 1019 (1997), we concluded that, while the judge erred in not instructing the jury on intoxication with respect to extreme

atrocity or cruelty, "[t]he jury's verdict [still] established that the defendant was guilty of murder," as "[t]here was ample evidence to support" it.  Here, apart from failing to instruct the jury to consider mental impairment for the purpose of atrocity or cruelty, the judge otherwise properly instructed the jury on intent and malice, and the other elements of murder in the second degree, and there was ample evidence to support such a verdict.

In such cases, "we have the option of directing a reduction in the verdict to murder in the second degree rather than ordering a new trial."  Commonwealth v. Lennon, 399 Mass. 443, 449 (1987).  "We will normally exercise that option where the Commonwealth has requested . . . that we do so, rather than grant a new trial at which the Commonwealth might prove murder in the first degree."  Id. at 450.  Because the Commonwealth has not made that request in this case, "on remand, the Commonwealth has the option of moving to have the defendant sentenced on the lesser included offense of murder in the second degree or of retrying the defendant for murder on the theory of extreme atrocity or cruelty."  Rutkowski, 459 Mass. at 800.  Accord Gonzalez, 469 Mass. at 423.

b.  Motion for a new trial.  "'A motion for a new trial is addressed to the sound discretion of the trial judge,' who may grant a new trial 'if it appears that justice may not have been

done'" (alteration omitted).  Commonwealth v. Jacobs, 488 Mass. 597, 600 (2021), quoting Commonwealth v. Kolenovic, 471 Mass. 664, 672 (2015), S.C., 478 Mass. 189 (2017).  "We review a decision on a motion for a new trial for an abuse of discretion," ascertaining whether the denial "resulted from 'a clear error of judgment in weighing the factors relevant to the decision such that the decision falls outside the range of reasonable alternatives.'"  Jacobs, supra, quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).  "Where a judge conducts an evidentiary hearing, we 'accept the judge's findings where they are supported by substantial evidence in the record'" (alteration omitted).  Jacobs, supra, quoting Commonwealth v. Velez, 487 Mass. 533, 540 (2021).

The defendant argues that, if his claims fail on appeal, then the motion judge committed reversible error by not granting him a new trial, because the trial transcript was inadequate to support his appeal and he was "entitled to a per se new trial where the Commonwealth as responsible for loss of the transcript."  We address each contention in turn.

i.  Adequacy of record.  "[A] defendant is entitled to a record of sufficient completeness to permit proper consideration of his claims.  However, this does not translate automatically into a complete verbatim transcript" (quotations and citations omitted).  Commonwealth v. Imbert, 479 Mass. 575, 577-578

(2018). "A new trial will not be granted 'unless the trial proceedings cannot be reconstructed sufficiently to present the defendant's claims.'" Id. at 578, quoting Harris, 376 Mass. at 78. As we have repeatedly held, "a statement of agreed facts" as an "alternative method[] of reporting the trial proceedings" is "constitutionally adequate if [it] bring[s] before the appellate court an account of the events sufficient to allow it to evaluate the defendant's contentions." Imbert, supra, quoting Harris, supra at 77.

As in Imbert, 479 Mass. at 579, "the defendant does not present a specific dispute over [the] contents [of the reconstruction] relating to any claim of error," other than claiming that not prevailing here means the stipulation has failed him. But this assertion begs the question. The defendant conceded at the evidentiary hearing in front of the motion judge that "the record has been reconstructed adequately to present the appellate issues," going so far as to say that the reconstruction efforts were "extremely successful." From September of 2005 to March of 2015, appellate counsel worked diligently to reconstruct the record based on trial records and notes, as well as a joint conference with trial counsel and the prosecutor. We discern no reversible error in the motion judge's determination that the reconstructed record was adequate for appeal.

ii.  Responsibility for loss of transcript.  The defendant renews an argument that he made at the evidentiary hearing on the reconstructed transcript:  that we should extend our ruling in Harris by requiring a per se new trial where the Commonwealth is at fault for the missing transcript and that, here, the Commonwealth includes a court reporter and clerk's office staff.  We decline to do so.

In Harris, 376 Mass. at 74, "the stenographic notes of the trial . . . had been stolen from the court reporter's car," and yet, we did not find that the Commonwealth was at fault for the missing transcripts.  Similarly, here, one of the court reporters "left her job with the Commonwealth, without having transcribed . . . three days of the [d]efendant's trial."  The trial court's administrative office intended to have this stenographer's tapes transcribed by a different court reporter, but "the tapes could not be located."  Four years after these inquiries, a clerk of the court found two of the three days of transcripts and shared them with defense appellate counsel.  Based on these facts, we decline to extend Harris in this instance.

We do not identify any abuse of discretion by the motion judge, and so the motion for a new trial was properly denied on these grounds.

c. <u>Review under G. L. c. 278, § 33E</u>. We have reviewed the record in accordance with G. L. c. 278, § 33E, and we discern no other basis for further relief.

3. <u>Conclusion</u>. For the foregoing reasons, we vacate the conviction of murder in the first degree and remand for the Commonwealth to move either for sentencing on a conviction of murder in the second degree or for a new trial on the theory of extreme atrocity or cruelty. We affirm the denial of the defendant's postconviction motion for a new trial on the grounds presented.

<u>So ordered</u>.